[L.A. No. 30645. Dec. 7, 1976.]

STEVEN DOUGLAS ROCKWELL, Petitioner, v.
THE SUPERIOR COURT OF VENTURA COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Richard E. Erwin, Public Defender, and Kenneth Cleaver, Assistant Public Defender, for Petitioner.

Wilbur F. Littlefield, Public Defender (Los Angeles), Dennis A. Fischer, Deputy Public Defender, Paul Halvonik, State Public Defender, Clifton Jeffers, Chief Assistant State Public Defender, Ezra Hendon, Deputy State Public Defender, Jerome B. Falk, Jr., Anthony G. Amsterdam, Jack Greenberg, James M. Nabrit III, Peggy C. Davis, Linda S. Greene, David Evan Kendall, William Bennett Turner, Lowell Johnston, William E. Hickman, Danaher, Gunn & Klynn, Charles C. Marson, Joseph Remcho, Robert Nicco, Public Defender (San Francisco), Sheldon Portman, Public Defender (Santa Clara) Kenneth M. Wells, Public Defender (Sacramento), and Ephraim Margolin as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Real Party in Interest.

**OPINION**

**WRIGHT, C. J.**—Steven Douglas Rockwell petitions this court for a writ of prohibition to restrain the Ventura County Superior Court from proceeding with a retrial on "special circumstances" allegations included in an information charging him with murder. We issued an alternative writ in response to his claim that the provisions of Penal Code sections

190 through 190.3,[1] which permit the imposition of the death penalty as punishment for first degree murder when any of the special circumstances charged in an accusatory pleading is found by the trier of fact, violate the Eighth and Fourteenth Amendments to the United States Constitution.

The petition raises none of the issues that were considered by this court in *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493

---

[1] Unless otherwise indicated, all statutory references herein are to the Penal Code.

Section 190 provides: "Every person guilty of murder in the first degree shall suffer death if any one or more of the special circumstances enumerated in Section 190.2 have been charged and found to be true in the manner provided in Section 190.1. Every person otherwise guilty of murder in the first degree shall suffer confinement in the state prison for life. Every person guilty of murder in the second degree is punishable by imprisonment in the state prison from five years to life."

Section 190.1 directs that a separate trial on the question of "special circumstances" follow the determination of guilt: "In any case in which the death penalty is to be imposed as the penalty for an offense only upon the finding of the truth of the special circumstances enumerated in Section 190.2, the guilt or innocence of the person charged shall first be determined without a finding as to penalty. In any such case the person charged shall be represented by counsel. If such a person has been found guilty of such an offense, and has been found sane on any plea of not guilty by reason of insanity, and any one or more of the special circumstances enumerated in Section 190.2 have been charged, there shall be further proceedings on the issue of the special circumstances charged. In any such proceedings the person shall be represented by counsel. The determination of the truth of any or all of the special circumstances charged shall be made by the trier of fact on the evidence presented. In case of a reasonable doubt whether a special circumstance is true, the defendant is entitled to a finding that it is not true. The trier of fact shall make a special finding that each special circumstance charged is either true or not true. Wherever a special circumstance requires proof of the commission or attempted commission of a crime, such crime shall be charged and proved pursuant to the general law applying to the trial and conviction of a crime.

"If the defendant was convicted by the court sitting without a jury, the trier of fact shall be a jury unless a jury is waived by the defendant with the consent of the defendant's counsel, in which case the trier of fact shall be the court. If the defendant was convicted by a plea of guilty the trier of fact shall be a jury unless a jury is waived by the defendant with the consent of his counsel. If the defendant was convicted by a jury, the trier of fact shall be the same jury unless, for good cause shown, the court discharges that jury, in which case a new jury shall be drawn to determine the issue of whether or not any of the special circumstances charged are true or not true.

"If the trier of fact finds, as to any person convicted of any offense under Section 190 requiring further proceedings that any one or more of the special circumstances enumerated in Section 190.2 as charged is true, the defendant shall suffer the penalty of death, and neither the finding that any of the remaining special circumstances charged is not true, nor if the trier of fact is a jury, the inability of the jury to agree on the issue of the truth or untruth of any of the remaining special circumstances charged, shall prohibit the imposition of such penalty.

"In any case in which the defendant has been found guilty by a jury, and the same or another jury is unable to reach a unanimous verdict that one or more of the special circumstances charged are true, and does not reach a unanimous verdict that all of such special circumstances charged are not true, the court shall dismiss the jury and shall

P.2d 880], related to whether capital punishment violates article I, section 17, of the California Constitution. Nor, since the claim is limited to an assertion that the California statutory procedures for determining who shall suffer death as a penalty for murder do not meet the constitutional criteria established by the United States Supreme Court, do we have before us the question of whether capital punishment is cruel and unusual *per se*.

For reasons that we shall explain below, we conclude that the statutes in question permit imposition of the death penalty in violation of the Eighth and Fourteenth Amendments, and that the writ should therefore issue.

Petitioner was charged by information with the murder of Linda Beth Coverly. The charging allegations asserted that the homicide was committed with malice; was wilful, deliberate, and premeditated; and occurred in the perpetration or attempted perpetration of rape. It was further alleged that "special circumstances" enumerated in section 190.2, subdivisions (b)(2), (b)(3)(ii), and (b)(3)(iii) were present.[2] A jury found

order a new jury impaneled to try the issues, but the issue of guilt shall not be retried by such jury, nor shall such jury retry the issue of the truth of any of the special circumstances which were found by a unanimous verdict of the previous jury to be untrue. If such new jury is unable to reach a unanimous verdict that one or more of the special circumstances it is trying are true, the court shall dismiss the jury and impose the punishment of confinement in the state prison for life."

[2]Section 190.2 provides: "The penalty for a person found guilty of first-degree murder shall be death in any case in which the trier of fact pursuant to the further proceedings provided for in Section 190.1 makes a special finding that:

"(a) The murder was intentional and was carried out pursuant to an agreement with the defendant. 'An agreement,' as used in this subdivision, means an agreement by the person who committed the murder to accept valuable consideration for the act of murder from any person other than the victim.

"(b) The defendant personally committed the act which caused the death of the victim and any of the following additional circumstances exist:

"(1) The victim is a peace officer, as defined in Section 830.1, subdivision (a) of Section 830.2, or subdivision (b) of Section 830.5, who, while engaged in the performance of his duty, was intentionally killed, and the defendant knew or reasonably should have known that such victim was a peace officer engaged in the performance of his duties.

"(2) The murder was willful, deliberate and premeditated and the victim was a witness to a crime who was intentionally killed for the purpose of preventing his testimony in any criminal proceeding.

"(3) The murder was willful, deliberate and premeditated and was committed during the commission or attempted commission of any of the following crimes:

"(i) Robbery, in violation of Section 211.

"(ii) Kidnapping, in violation of Section 207 or Section 209. Brief movements of a victim which are merely incidental to the commission of another offense and which do not substantially increase the victim's risk of harm over that necessarily inherent in the

petitioner guilty of first degree murder.[3] The jury was dismissed and a mistrial declared as to the special circumstances phase of the trial, however, when the jury was unable to agree on the special circumstances allegations. Petitioner contends that he should not be required to undergo a retrial of the special circumstances charges inasmuch as the United States Supreme Court has held that death penalty statutes which do not provide for consideration of mitigating circumstances in the decision to impose capital punishment violate the Eighth and Fourteenth Amendments. (*Gregg* v. *Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909]; *Proffitt* v. *Florida* (1976) 428 U.S. 242 [49 L.Ed.2d 913, 96 S.Ct. 2960]; *Jurek* v. *Texas* (1976) 428 U.S. 262 [49 L.Ed.2d 929, 96 S.Ct. 2950]; *Woodson* v. *North Carolina* (1976) 428 U.S. 280 [49 L.Ed.2d 944, 96 S.Ct. 2978]; *Roberts* v. *Louisiana* (1976) 428 U.S. 325 [49 L.Ed.2d 974, 96 S.Ct. 3001].) He argues that the California procedures set out in sections 190 through 190.3 are substantially identical in this respect to those of North Carolina and Louisiana which the court struck down in *Woodson* and *Roberts, supra.*

Preliminarily, we reject the People's suggestion that this petition is premature because petitioner would have a remedy by appeal should the special circumstances allegations be found true after trial. By issuance of the alternative writ we have determined that appeal is not an adequate remedy. ■ Prohibition lies to restrain a court from acting in excess of its jurisdiction. (*Safer* v. *Superior Court* (1975) 15 Cal.3d 230, 242 [124 Cal.Rptr. 174, 540 P.2d 14]; *Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 290-291 [109 P.2d 942, 132 A.L.R. 715].) Trial pursuant to an unconstitutional statute may therefore be restrained by prohibition.

---

other offense do not constitute kidnapping within the meaning of this paragraph.

"(iii) Rape by force or violence, in violation of subdivision (2) of Section 261; or by threat of great and immediate bodily harm, in violation of subdivision (3) of Section 261.

"(iv) The performance of lewd or lascivious acts upon the person of a child under the age of 14, in violation of Section 288.

"(v) Burglary, in violation of subdivision (1) of Section 460, of an inhabited dwelling housing entered by the defendant with an intent to commit grand or petit larceny or rape.

"(4) The defendant has in this or in any prior proceeding been convicted of more than one offense of murder of the first or second degree. For the purpose of this paragraph an offense committed in another jurisdiction which if committed in California would be punishable as first or second degree murder shall be deemed to be murder of the first or second degree."

[3]Petitioner was also charged with and convicted of kidnaping (§ 207), rape (§ 261, subd. 3) with intentional infliction of great bodily injury (§ 264), and use of a firearm in each offense (§ 12022.5). No issue with respect to these counts is before us in this proceeding.

(*Dillon* v. *Municipal Court* (1971) 4 Cal.3d 860, 866 fn. 6 [94 Cal.Rptr. 777, 484 P.2d 945]; *Parr* v. *Municipal Court* (1971) 3 Cal.3d 861 [92 Cal.Rptr. 153, 479 P.2d 353].)

The People recognize that under the United States Supreme Court's decisions in *Gregg* v. *Georgia, supra,* 428 U.S. 153 and the companion cases decided the same day, statutes providing for imposition of the death penalty may neither make that penalty mandatory nor give the jury or judge charged with determining the penalty absolute discretion in the choice of life or death, but must provide standards so that the sentencing authority will "focus on the particularized circumstances of the crime and the defendant." (*Gregg* v. *Georgia, supra,* 428 U.S. 153, 199 [49 L.Ed.2d 859].) ▮ A statute which enumerates aggravating circumstances, one or more of which must be found as a prerequisite to imposition of the death penalty but which does not provide for "meaningful opportunity for consideration of mitigating factors presented by circumstances of the particular crime or by the attributes of the individual offender" (*Roberts* v. *Louisiana, supra,* 428 U.S. 325, 333 [49 L.Ed.2d 974, 982]) permits the imposition of capital punishment in violation of the Eighth Amendment's proscription of cruel and unusual punishment, as does a statute which makes death a mandatory punishment for specified categories of murder. (*Woodson* v. *North Carolina, supra,* 428 U.S. 280, 305 [49 L.Ed.2d 944, 961-962].) ▮ "[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." (*Id.,* at p. 304 [49 L.Ed.2d at p. 961].)

Section 190 specifies that "[e]very person guilty of murder in the first degree *shall suffer death* if any one or more of the special circumstances enumerated in Section 190.2 have been charged and found to be true in the manner provided in Section 190.1." (Italics added.) Section 190.1 specifies that "[i]f the trier of fact finds . . . that any one or more of the special circumstances enumerated in Section 190.2 as charged is true, *the defendant shall suffer the penalty of death . . . .*" (Italics added.) And section 190.2 further specifies that "[t]he penalty for a person found guilty of first-degree murder *shall be death* in any case in which the trier of fact" makes a finding that one or more charged special circumstances exist. (Italics added.)

The People do not claim that the "special circumstances" enumerated in section 190.2 are other than aggravating factors creating categories of first degree murder for which death is the prescribed penalty. It is urged, however, that notwithstanding the Legislature's repeated stipulation that death "shall" be the penalty for murders thus categorized, capital punishment is not, in fact, mandatory because both the trial judge and the appellate court have power to reduce the penalty from death to life imprisonment. This power, it is argued, makes possible consideration of mitigating factors in the circumstances of the offense and in the character and record of the individual defendant as required by the Eighth Amendment.

The People find this power in sections 1181, subdivision 7[4], and 1385.[5] The former had been held to allow a trial court to reduce to life imprisonment a death penalty decreed by a jury under capital punishment provisions in effect prior to the enactment of sections 190.1 and 190.2 in 1973. (*People* v. *Moore* (1960) 53 Cal.2d 451, 454 [2 Cal.Rptr. 6, 348 P.2d 584], cert. den., 364 U.S. 895 [5 L.Ed.2d 189, 81 S.Ct. 226].) The latter, it is suggested, permits a trial court to strike special circumstances allegations "in the interest of justice," and thus to exercise mercy based on mitigating circumstances.

In order to determine whether the powers granted to trial and appellate courts by sections 1181, subdivision 7, and 1385 are sufficiently broad to meet the Eighth Amendment criteria for imposition of capital punishment, it is first necessary to examine those statutory schemes recently found constitutionally acceptable by the Supreme Court, and to compare them with those deemed unacceptable by that court.

*Gregg* v. *Georgia, supra,* 428 U.S. 153, is the leading case in which the court set forth its views both as to the constitutionality of capital punishment in general, and the features of the Georgia statutory

---

[4]Section 1181, subdivision 7, provides that a new trial may be granted: "When the verdict or finding is contrary to law or evidence, but in any case wherein authority is vested by statute in the trial court or jury to recommend or determine as a part of its verdict or finding the punishment to be imposed, the court may modify such verdict or finding by imposing the lesser punishment without granting or ordering a new trial, and this power shall extend to any court to which the case may be appealed."

[5]Section 1385 provides: "The court may either of its own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. The reasons of the dismissal must be set forth in an order entered upon the minutes. No dismissal shall be made for any cause which would be ground of demurrer to the accusatory pleading."

procedures which offered assurance that the decision to inflict the death penalty in particular cases would be made and affirmed on the basis of criteria adequate to avoid arbitrary, capricious or discriminatory (and thus unconstitutional) decisions. Only two members of the court, Justices Brennan and Marshall, were of the view that the death penalty is excessive and thus unconstitutional *per se* under the Eighth Amendment. The remaining members, Justices Stewart, Powell, and Stevens, in the lead opinion, concurred in by Justice White with whom the Chief Justice and Justice Rehnquist joined in a separate opinion and Justice Blackmun who separately concurred in the judgment, all agreed that the Georgia procedures met the test set forth earlier in *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726], that the death penalty "not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner," (428 U.S. at p. 188 [49 L.Ed.2d at p. 883]) and that "the decision to impose it . . . be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." (*Id.,* at p. 199 [49 L.Ed.2d at p. 889].)

Several features of the Georgia legislation enacted in response to *Furman* were particularly noted by Justice Stewart in his opinion upholding that death penalty scheme as contributing assurance that the *Furman* defects had been eliminated. First among these was "narrow-[ing] the class of murderers subject to capital punishment by specifying 10 statutory aggravating circumstances, one of which must be found by the jury to exist beyond a reasonable doubt before a death sentence can ever be imposed."[6] (428 U.S. at pp. 196-197 [49 L.Ed.2d at pp. 887-888].) Next was the fact that "the jury is authorized to consider any other

---

[6]Georgia Code Annotated sections 27-2534.1 subds. (b), (c) (Supp. 1975) provides:

"(b) In all cases of other offenses for which the death penalty may be authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider, any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating circumstances which may be supported by the evidence:

"(1) The offense of murder, rape, armed robbery, or kidnapping was committed by a person with a prior record of conviction for a capitol felony, or the offense of murder was committed by a person who has a substantial history of serious assaultive criminal convictions.

"(2) The offense of murder, rape, armed robbery, or kidnapping was committed while the offender was engaged in the commission of another capital felony, or aggravated battery, or the offense of murder was committed while the offender was engaged in the commission of burglary or arson in the first degree.

"(3) The offender by his act of murder, armed robbery, or kidnapping knowingly created a great risk of death to more than one person in a public place by means of a

appropriate aggravating or mitigating circumstances." (*Id.*) Thus, Justice Stewart noted, the jury's attention was directed both to the particular circumstances of the crime and to relevant personal characteristics of the defendant such as his past record, youth, cooperation with the police, and his emotional state at the time of the offense. It is noteworthy in this regard that the Georgia procedure permits the judge or jury to hear argument on and "additional evidence in extenuation, mitigation, and aggravation of punishment . . . [p]rovided, however, that only such evidence in aggravation as the State has made known to the defendant prior to the trial shall be admissible." (Ga. Code Ann. § 27-2503 (Supp. 1975).) Under this provision "the defendant is accorded substantial latitude as to the types of evidence that he may introduce." (428 U.S. at p. 164 [49 L.Ed.2d at p. 869].)

Finally, Justice Stewart found a further safeguard against arbitrariness and discrimination in the application of the death penalty in the Georgia

weapon or device which would normally be hazardous to the lives of more than one person.

"(4) The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value.

"(5) The murder of a judicial officer, former judicial officer, district attorney or solicitor or former district attorney or solicitor during or because of the exercise of his official duty.

"(6) The offender caused or directed another to commit murder or committed murder as an agent or employee of another person.

"(7) The offense of murder, rape, armed robbery, or kidnapping was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.

"(8) The offense of murder was committed against any peace officer, corrections employee or fireman while engaged in the performance of his official duties.

"(9) The offense of murder was committed by a person in, or who has escaped from, the lawful custody of a peace officer or place of lawful confinement.

"(10) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of himself or another.

"(c) The statutory instructions as determined by the trial judge to be warranted by the evidence shall be given in charge and in writing to the jury for its deliberation. The jury, if its verdict be a recommendation of death, shall designate in writing, signed by the foreman of the jury, the aggravating circumstance or circumstances which it found beyond a reasonable doubt. In non-jury cases the judge shall make such designation. Except in cases of treason or aircraft hijacking, unless at least one of the statutory aggravating circumstances enumerated in section 27-2534.1(b) is so found, the death penalty shall not be imposed." (§ 27-2534.1 (Supp. 1975).)

In *Arnold* v. *State* (1976) 236 Ga. 534, 540 [224 S.E.2d 386, 391], the Supreme Court of Georgia held unconstitutional that portion of the first circumstance encompassing persons who have a "substantial history of serious assaultive criminal convictions" because it did not set "sufficiently 'clear and objective standards' " to be constitutional.

procedure for expedited appeal and oversight of capital punishment by the Georgia Supreme Court which is charged by statute with responsibility to determine not only whether the evidence supports the jury's determination as to special circumstances, but also whether the death penalty "was imposed under the influence of passion, prejudice, or any other arbitrary factor," and to consider whether that penalty is excessive in comparison with penalties "imposed in similar cases, considering both the crime and the defendant." (Ga. Code Ann. § 27-2537 (Supp. 1975).) Provision is also made for compilation of the data necessary to the last decision, and for preparation by the trial judge of a report regarding factors relevant to possible influence of passion or prejudice in the jury's decisions, and to any disproportionality in the sentence. This review, Justice Stewart wrote, "serves as a check against the random or arbitrary imposition of the death penalty. In particular, the proportionality review substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury." (428 U.S. at p. 206 [49 L.Ed.2d at p. 893].)

Concurring in the judgment, Justice White, joined by the Chief Justice and Justice Rehnquist, described the appellate review procedure as "an important aspect" of the Georgia scheme, but implied it might not be necessary to meet the requirements of *Furman* (428 U.S. at p. 211 [49 L.Ed.2d at pp. 895-896].) The aspects of the Georgia scheme which a majority of the court considered essential to its constitutionality therefore appear to be the narrowly defined aggravating factors or categories of murder for which capital punishment is authorized and the opportunity for the defendant to present evidence and argument on and to have the jury consider mitigating circumstances with respect to both the commission of the offense and his personal characteristics which militate against imposition of the extreme penalty.

This analysis finds support in the court's reasoning in *Proffitt* v. *Florida, supra,* 428 U.S. 242 and *Jurek* v. *Texas, supra,* 428 U.S. 262 in which death penalty legislation of Florida and Texas was also upheld. Patterned after the Model Penal Code, the Florida law provides for a separate penalty hearing after conviction of a capital offense. At this hearing evidence may be introduced of any matters relevant to statutory

aggravating[7] and/or mitigating circumstances,[8] and counsel may argue whether, in light of this evidence, death is an appropriate punishment. The jury must consider whether sufficient mitigating circumstances exist to outweigh those aggravating circumstances and whether the defendant should be sentenced to life imprisonment or death. This jury verdict is advisory only, however, and the sentencing judge must independently weigh the aggravating and mitigating circumstances. If the judge imposes death, he must set out the facts upon which he has determined the existence of aggravating circumstances and that the mitigating circumstances do not outweigh them. Although the appellate review is not as comprehensive as that in Georgia, the lead opinion in *Proffitt,* of Justices Stewart, Powell, and Stevens, noted that the requirement that the sentencing judge justify the death penalty with written findings assured meaningful appellate review. These justices concluded that these procedures, too, met the constitutional deficiencies of the *Furman* statute because: "The sentencing authority in Florida, the trial judge, is directed to weigh eight aggravating factors against seven mitigating factors to determine whether the death penalty shall be imposed. This determination requires the trial judge to focus on the circumstances of the crime and the character of the individual defendant. . . . [¶] Under Florida's

---

[7]Florida Statutes Annotated section 921.141 (5) (Supp. 1976-1977) lists as aggravating circumstances:

"(a) The capital felony was committed by a person under sentence of imprisonment.

"(b) The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person.

"(c) The defendant knowingly created a great risk of death to many persons.

"(d) The capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit any robbery, rape, arson, burglary, kidnapping, or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb.

"(e) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

"(f) The capital felony was committed for pecuniary gain.

"(g) The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.

"(h) The capital felony was especially heinous, atrocious, or cruel."

[8]"(a) The defendant has no significant history of prior criminal activity.

"(b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(c) The victim was a participant in the defendant's conduct or consented to the act.

"(d) The defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor.

"(e) The defendant acted under extreme duress or under the substantial domination of another person.

"(f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

"(g) The age of the defendant at the time of the crime." (§ 921.141(6) (Supp. 1976-1977).)

capital-sentencing procedures, in sum, trial judges are given specific and detailed guidance to assist them in deciding whether to impose a death penalty or imprisonment for life. Moreover, their decisions are reviewed to ensure that they are consistent with other sentences imposed in similar circumstances. . . . On its face the Florida system thus satisfies the constitutional deficiencies identified in *Furman*." (428 U.S. at p. 253 [49 L.Ed.2d at pp. 922-923].) Again Justice White, joined by the Chief Justice and Justice Rehnquist, concurred in the judgment, this time noting that he agreed "with the plurality . . . that although the statutory aggravating and mitigating circumstances are not susceptible to mechanical application . . . they are by no means so vague and overbroad as to leave the discretion of the sentencing authority unfettered." (428 U.S. at p. 260 [49 L.Ed.2d at p. 927].)

Of crucial importance to constitutional validity of the Florida procedure was the fact that the "sentencing authority"—that it was the judge rather than the jury was not considered significant—was charged with responsibility to hear evidence on both aggravating and mitigating factors, and to decide with the assistance of "specific and detailed guidance" whether to impose the death penalty. (428 U.S. at p. 253 [49 L.Ed.2d at p. 923].)

The Texas law permits imposition of the death penalty for a limited category of murders.[9] The court found that this limitation, by encompassing conduct similar to that for which death was a permissible punishment in Georgia and Florida, serves the same purpose as does the itemization of aggravating circumstances in the statutes of those states. Texas also makes provision for a separate penalty trial after guilt has

---

[9]Texas Penal Code, article 1257 (1973) provided:

"(a) Except as provided in subsection (b) of this Article, the punishment for murder shall be confinement in the penitentiary for life or for any term of years not less than two.

"(b) The punishment for murder with malice aforethought shall be death or imprisonment for life if:

"(1) the person murdered a peace officer or fireman who was acting in the lawful discharge of an official duty and who the defendant knew was a peace officer or fireman;

"(2) the person intentionally committed the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, forcible rape, or arson;

"(3) the person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration;

"(4) the person committed the murder while escaping or attempting to escape from a penal institution;

"(5) the person, while incarcerated in a penal institution, murdered another who was employed in the operation of the penal institution."

been adjudicated. At that hearing any evidence and/or argument relevant to the appropriate penalty is admissible. If after that hearing, upon consideration of the evidence, the jury unanimously answers "yes" to each of three questions, the death penalty is to be imposed. Those questions are:

"(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

"(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

"(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased." (Tex. Code Crim. Proc., Art. 37.071(b).)

The court found that in directing the focus of the sentencing authority to specific aggravating factors, the Texas statute differs from those of Florida and Georgia only in permitting capital punishment for a smaller class of murderers. The statute does not, however, on its face require consideration of mitigating factors, prompting Justices Stewart, Powell and Stevens to warn that "a sentencing system that allowed the jury to consider only aggravating circumstances would almost certainly fall short of providing the individualized sentencing determination . . . required by the Eighth and Fourteenth Amendments. . . . A jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed. [¶] Thus, in order to meet the requirement of the Eighth and Fourteenth Amendments, a capital-sentencing system must allow the sentencing authority to consider mitigating circumstances." (*Jurek* v. *Texas, supra,* 428 U.S. at p. 271 [49 L.Ed.2d at p. 938].) The court then found that as construed by the Texas Court of Criminal Appeals to permit a defendant to introduce and the jury to consider evidence of mitigating circumstances relevant to the second question, the Texas procedure did focus the attention of the jury on an "objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death." (*Id.,* at pp. 273-274 [49 L.Ed.2d at p. 939].)

By contrast, the court found the capital punishment laws of North Carolina and Louisiana constitutionally lacking. (*Woodson* v. *North Carolina, supra,* 428 U.S. 280; *Roberts* v. *Louisiana, supra,* 428 U.S. 325.) The North Carolina law, which made death a mandatory punishment for all first degree murder[10] and thereby sought to remove all discretion as to penalty from the jury was found defective on grounds that a statute imposing death as a penalty for every person convicted of a specified offense departs too far from the "evolving standards of decency that mark the progress of a maturing society" by which a plurality of the court had suggested in *Trop* v. *Dulles* (1958) 356 U.S. 86, 101 [2 L.Ed.2d 630, 642, 78 S.Ct. 590], punishment be tested under the Eighth Amendment. The plurality also found the North Carolina statute defective in its failure to base the decision to inflict the death penalty on a "particularized consideration of relevant aspects of the character and record of each convicted defendant." (*Woodson* v. *North Carolina, supra,* 428 U.S. at p. 303 [49 L.Ed.2d at pp. 960-961].)

Of more significance, however, is the Louisiana law which the court also found constitutionally wanting. Louisiana then defined first degree murder, for which death was the prescribed punishment, in terms which encompass several of the special circumstances included in section 190.2.[11] No separate penalty trial was provided and the death penalty was ostensibly mandatory. The jury was to be instructed on and provided with verdict forms not only for first degree murder, but also for lesser

---

[10]North Carolina General Statutes, section 14-17 (Cum. Supp. 1975) provides: "*Murder in the first and second degree defined; punishment.*—A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, kidnapping, burglary or other felony shall be deemed to be murder in the first degree and shall be punished with death. . . ."

[11]Louisiana Revised Statutes Annotated section 14:30 (1974) provided:

"*First degree murder.* First degree murder is the killing of a human being:

"(1) When the offender has a specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, aggravated rape or armed robbery; or

"(2) When the offender has a specific intent to kill, or to inflict great bodily harm upon, a fireman or a peace officer who was engaged in the performance of his lawful duties; or

"(3) Where the offender has a specific intent to kill or to inflict great bodily harm and has previously been convicted of an unrelated murder or is serving a life sentence; or

"(4) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person; [or]

"(5) When the offender has specific intent to commit murder and has been offered or has received anything of value for committing the murder.

"For the purposes of paragraph (2) herein, the term peace officer shall be defined and

offenses of second degree murder and manslaughter, as well as not guilty, whether or not there was evidence from which it could be inferred that the offense was less than first degree murder. This procedure was characterized by the court as an invitation to the jury to convict the defendant of a lesser offense whenever they believed the death penalty to be inappropriate, thus introducing an "element of capriciousness in making the jurors' power to avoid the death penalty dependent on their willingness to accept this invitation to disregard the trial judge's instructions. The Louisiana procedure neither provides standards to channel jury judgments nor permit review to check the arbitrary exercise of the capital jury's *de facto* sentencing discretion. [¶] . . . As in North Carolina, there are no standards provided to guide the jury in the exercise of its power to select those first degree murderers who will receive death sentences, and there is no meaningful appellate review of the jury's decision." (*Roberts* v. *Louisiana, supra,* 428 U.S. at p. 335 [49 L.Ed.2d at pp. 982-983].)

We turn now to consideration of the People's contention that the powers granted to trial courts by sections 1181, subdivision 7, and 1385, and that granted appellate courts by section 1181, subdivision 7, are adequate to meet the criteria established by the United States Supreme Court. To do so it must appear that the death penalty will be imposed on defendants subject to sections 190 through 190.3 only after the "sentencing authority" has considered evidence of both aggravating and mitigating circumstances, in light of specific and detailed standards offering such sufficient guidance in deciding when the death penalty should be imposed as to offer assurance that capital punishment will not be decreed in an arbitrary, capricious, or discriminatory manner.

No argument is made that the "special circumstances" delineated in section 190.2 fail to meet the court's criterion that those aggravating circumstances which warrant capital punishment be specifically set forth. Our inquiry is therefore directed to whether the "sentencing authority" is given the opportunity to consider mitigating as well as aggravating factors and whether it has sufficient guidance as to what mitigating factors should be considered, in deciding whether to impose the death penalty. It follows that we must also determine whether the defendant is afforded adequate opportunity to present to the sentencing authority

include any constable, sheriff, deputy sheriff, local or state policeman, game warden, federal law enforcement officer, jail or prison guard, parole officer, probation officer, judge, district attorney, assistant district attorney or district attorney's investigator.
 "Whoever commits the crime of first degree murder shall be punished by death."

evidence on and argument regarding these mitigating factors and their relevance to the appropriate penalty. If our inquiry is limited to the express provisions of sections 190 through 190.3,[12] the answer to these questions necessarily must be "no," since those sections include no provision either for presentation of evidence regarding mitigating circumstances or for consideration of such circumstances, at the hearing on special circumstances.

■ The People argue that mitigating factors other than those relevant to determination of the defendant's guilt or innocence are considered at the special circumstances phase of the trial in that the defendant may present evidence to show that he did not personally commit the act that caused death (§§ 190.2, subd. (b), 190.3, subd. (b)), or to establish that the killing was not wilful, deliberate, and premeditated (§ 190.2, subd. (b)(3)), and thereby avoid imposition of the death penalty. Evidence which merely refutes the existence of an alleged special circumstance goes only to aggravating factors, however, and does not afford a basis for the "particularized consideration of the character and record of each convicted defendant" that the Supreme Court found lacking in the North Carolina statutory scheme. It does not serve to focus the attention of the jury or court on both the "particularized circumstances of the individual offense and the individual offender" as did the constitutionally adequate Texas procedure (*Jurek* v. *Texas, supra,* 428 U.S. 262, 274 [49 L.Ed.2d 929, 939]), and does not afford the "sentencing authority" the opportunity to weigh the aggravating and mitigating factors in reaching a decision to impose the death penalty. Similarly the exclusion of an entire category of youthful murderers from potential application of the death penalty (§ 190.3) fails to afford individualized consideration of the circumstances of the offender or the offense.

Thus sections 190 through 190.3, like the laws of North Carolina and Louisiana, by their terms make death a mandatory penalty for those

---

[12]Section 190.3 exempts certain defendants from the death penalty, providing:

"(a) Notwithstanding any other provision of law, the death penalty shall not be imposed upon any person who was under the age of 18 years at the time of the commission of the crime. The burden of proof as to the age of such person shall be upon the defendant.

"(b) Except when the trier of facts finds that a murder was committed pursuant to an agreement as defined in subdivision (a) of Section 190.2, or when a person is convicted of a violation of Section 37 or 128, the death penalty shall not be imposed upon any person who is a principal in the commission of a capital offense unless he was personally present during the commission of the act or acts causing death, and directly committed or physically aided in the commission of such act or acts."

categories of murder described in section 190.2, without provision for consideration of mitigating factors.

■ The People suggest, however, that sections 1181, subdivision 7, and 1385 permit the trial held on the special circumstances allegations pursuant to section 190.1 to be conducted as a bifurcated hearing during which the jury first determines the truth of these allegations, and the court then decides whether to reduce the otherwise applicable death penalty to life imprisonment. The People thus equate the judge to the "sentencing authority" whether or not the special circumstances are tried by a jury, and argue that the judge has power to base his decision as to penalty on mitigating circumstances and in the interest of mercy. This power, the People urge, is not the constitutionally impermissible unbridled discretion which undermined pre-*Furman* law, because, before the death penalty can be imposed, the trier of fact must examine the particular circumstances of the individual offense.

Two flaws in this argument are immediately apparent. First, no provision is made under section 190.1, section 1181, subdivision 7, section 1385, or otherwise for the introduction of evidence of mitigating factors, and no guidance is given as to what factors should be considered "mitigating." Second, the procedures approved by the United States Supreme Court require that the sentencing authority, be it judge or jury, weigh the aggravating and mitigating factors in light of specific and detailed guidelines. None of the approved procedures permits the trier of fact to find the aggravating factors of the offense and then permits reduction of an otherwise mandatory death penalty only if the sentencing authority independently finds mitigating circumstances sufficient to warrant mercy.

Even if we assume that such a procedure is sanctioned by the Eighth and Fourteenth Amendments, however, neither section 1181, subdivision 7, nor section 1385, permits a trial judge to act in the manner suggested by the People. Section 1181 empowers the trial court to grant *a new trial* upon application of the defendant "when a verdict has been rendered or a finding made against the defendant." Subdivision 7 provides that the court may, in lieu of granting a new trial, reduce the punishment when the "verdict or finding is contrary to law or evidence," but the statute expressly provides that this power is to be exercised "in any case wherein

authority is vested by statute in the trial court or jury to recommend or determine as part of its verdict or finding the punishment to be imposed . . . ."

By its terms, subdivision 7 of section 1181 is presently inapplicable to the death penalty. Section 190.2 states that death shall be imposed when the trier of fact makes a finding that one or more special circumstances existed in the commission of first degree murder. Under section 190.2, therefore, the trier of fact has no authority to "recommend or determine as a part of its verdict or finding the punishment to be imposed." Further, any motion for a new trial under this subdivision on grounds that "the verdict or finding is contrary to law or evidence" is necessarily directed exclusively to the finding of special circumstances, the only finding which the trier of fact is called upon, or permitted, to make.

The People suggest that we may interpret subdivision 7 in such a way that, on a motion for new trial made on grounds that the finding of special circumstances is contrary to the law or the evidence, the court may conduct an evidentiary hearing on the existence of mitigating circumstances, and, if mitigation is found, impose a sentence of life imprisonment rather than death. The express purpose of the hearing provided by section 190.1, however, is to determine whether "any one or more of the special circumstances enumerated in section 190.2 as charged is true." The possible existence of mitigating factors is outside that purpose.

The procedure suggested by the People would not only expand the function of the motion for new trial beyond that of reviewing a verdict or finding already made by the trier of fact to an evidentiary hearing on an issue never considered by the trier of fact, but, contrary to every indication of legislative intent, would also impose responsibility for determining which defendants should be sentenced to death on the trial judge. At no time since the penalty of death was made discretionary in 1874 (Code Am. 1873-74, ch. 508, § 1, p. 457) has the Legislature placed this awesome burden exclusively on the trial judge.[13]

We conclude that section 1181, subdivision 7, presently does not, and cannot reasonably be interpreted to, permit a trial court to conduct an evidentiary hearing on the existence of mitigating circumstances, and

---

[13]From 1874 to 1957 a guilty pleading defendant thereby waived his right to a jury trial on the penalty, but a 1957 amendment to section 190 eliminated the provision that the court determine the penalty on a plea of guilty. (Stats. 1957, ch. 1968, § 1, p. 3509.)

does not authorize a trial judge to reduce to life imprisonment the penalty of death which section 190.1 provides a defendant shall suffer if the trier of fact finds any one or more special circumstances as charged to be true.

A fortiori, the power granted this court by section 1181, subdivision 7, to modify a verdict by imposing a lesser punishment, if applicable to a sentence of death imposed pursuant to section 190.2, cannot assure the requisite individualized consideration which the United States Supreme Court held necessary to satisfy the Eighth and Fourteenth Amendments. The automatic appeal from a judgment imposing death (§ 1239) does offer the prompt review by a court of statewide jurisdiction which the court found to be an additional "check against the random or arbitrary imposition of the death penalty" in *Gregg* v. *Georgia, supra,* 428 U.S. 153, 206 [49 L.Ed.2d 859, 893], but the California procedures leading to the decision to impose the death penalty do not permit the same "meaningful review" of that decision as do those of Georgia. Inasmuch as neither section 190.1 nor subdivision 7 of section 1181 provides an opportunity for a defendant to present evidence of mitigating circumstances, and no guidelines have been provided by the Legislature upon which to weigh mitigating circumstances against the aggravating factors which permit imposition of the death penalty, the record affords no basis upon which a reviewing court can assess whether, in a particular case, death is an excessive punishment, is disproportionate to penalties imposed in similar cases, or is the product of "passion, prejudice, or any other arbitrary factor." (*Gregg* v. *Georgia, supra,* 428 U.S. 153, 204 [49 L.Ed.2d 859, 892].)

The People also suggest that since the trial court's power to dismiss an action under section 1385 includes the power to dismiss a part but not all of the allegations of an accusatory pleading in the interest of justice, even after a jury verdict of guilt (*People* v. *Superior Court (Howard)* (1968) 69 Cal.2d 491, 501 [72 Cal.Rptr. 330, 446 P.2d 138]), it may dismiss an allegation of special circumstances in the interest of justice if mitigating circumstances suggest that the death penalty is not an appropriate punishment. Although section 1385 provides that a dismissal "in furtherance of justice" may be ordered either on the motion of the district attorney, or on the court's motion, a defendant may invite the court to exercise its power by an application to strike a count or allegation of an accusatory pleading, and the court must consider evidence offered by the defendant in support of his assertion that the

dismissal would be in furtherance of justice. (*In re Cortez* (1971) 6 Cal.3d 78 [98 Cal.Rptr. 307, 490 P.2d 819], *People* v. *Tenorio* (1970) 3 Cal.3d 89 [89 Cal.Rptr. 249, 473 P.2d 993].) Thus, unlike subdivision 7, of section 1181, section 1385 does provide a procedure which would permit the trial court to consider striking special circumstances allegations and findings if section 1385 is applicable to allegations made pursuant to section 190.2.

We have not heretofore had occasion to consider whether this power to strike allegations in an accusatory pleading extends to the integrated statutory scheme for imposition of the death penalty established by sections 190 through 190.3. The language of those sections, the omission therefrom of any provision for a hearing on mitigating circumstances, and the history of their adoption leads us to conclude that this would be contrary to the legislative purpose. The Legislature did not intend the jury verdict on special circumstances to be merely advisory, but contemplated death as a mandatory penalty whenever special circumstances were found unless precluded by section 190.3.

Our conclusion is based first on the clear language of the statute which we are obliged to interpret according to its usual and ordinary import. (*People* ex rel. *Younger* v. *Superior Court* (1976) 16 Cal.3d 30, 43 [127 Cal.Rptr. 122, 544 P.2d 1322]; *People* v. *Knowles* (1950) 35 Cal.2d 175, 182-183 [217 P.2d 1].) The Legislature has directed in mandatory language, in sections 190, 190.1, and 190.2 that a person found guilty of first degree murder "shall suffer death" (§ 190), "shall suffer the penalty of death" (§ 190.1), and "the penalty . . . shall be death" (§ 190.2), in any case in which a special circumstances allegation is found to be true. This direction is supplemented in section 190.1 with detailed procedures by which such special circumstances are to be charged, how the question is to be tried, including specific rules regarding representation by counsel,[14] burden of proof, how findings are to be made, and when retrial of the question shall be had. Also included is a direction that if two juries have been unable to reach a unanimous verdict that one or more of the special circumstances are true, "the court shall dismiss the jury and impose the punishment of confinement in the state prison for life." The Legislature gave the court the power to impose a sentence of life imprisonment only in this instance. Section 190.1 permits the defendant to waive a jury and have the special circumstances allegations tried to the court. In this case,

[14]We express no opinion on the validity of this requirement which was enacted prior to *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]. (See *People* v. *McDaniel* (1976) 16 Cal.3d 156, 164-165 [127 Cal.Rptr. 467, 545 P.2d 843].)

too, the section specifies that if the trier of fact finds an allegation true, the penalty shall be death. No part of section 190.1 suggests that the court which has made such a finding may then strike the allegation it has found true and avoid the command that the death penalty be imposed. These detailed provisions governing the manner by which special circumstances are to be charged and found lead to the conclusion that sections 190 through 190.3 are special legislation and that the court presently has no power under the general grant of authority of section 1385 to strike special circumstances allegations in the interest of justice as an exercise of mercy. (Code Civ. Proc., § 1859; *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 420 [128 Cal.Rptr. 183, 546 P.2d 687]; *People* v. *Gilbert* (1969) 1 Cal.3d 475, 479 [82 Cal.Rptr. 724, 462 P.2d 580].)

Our conclusion that section 1385 does not permit the trial court to strike special circumstances allegations found true pursuant to the procedures set out in section 190.1 is further supported by the legislative history of sections 190 through 190.3. Enacted in their present form in 1973 (Stats. 1973, ch. 719, § 4, p. 1298), these provisions were introduced on March 14, 1973, as Senate Bill No. 450. The Legislative Counsel's digest of the proposed legislation advised the legislators that the purpose of the bill was to provide death as the penalty for specified offenses and that it would "delete[] specified provisions for imposition of alternate penalty of death or life imprisonment at discretion of court or jury trying same." None of the subsequent amendments by the Senate or the Assembly reflects an intent to restore that discretion. (See 1 Sen. J. (1973-1974 Reg. Sess.) p. 1029; 4 Sen. J. (1973-1974 Reg. Sess.) p. 5980.) To the contrary, the amendments of the bill deleting provisions which would have permitted consideration of mitigating circumstances, confirm the legislative intent that death be the mandatory penalty upon finding "special circumstances."[15]

---

[15]As originally proposed section 190.2 provided: "The penalty for a person found guilty of first-degree murder shall be death in any case in which the trier of fact pursuant to the further proceedings provided for in Section 190.1 makes a special finding that any of the following is true:

"(a) That the murder was intentional and was carried out pursuant to an agreement. 'An agreement,' as used in this subdivision, means an agreement by the person who committed the murder to accept consideration from any other person for the act of murder.

"(b) That the defendant personally committed the act which caused the death of the victim and any of the following additional circumstances exist:

"(1) The person killed is a peace officer, as defined in Section 830.1, subdivision (a) of Section 830.2, or subdivision (b) of Section 830.5, who, while in the performance of his duty, was killed intentionally, and the defendant knew or reasonably should have known

The People argue finally that the defects in the California statutory scheme for imposition of capital punishment can be overcome by judicially mandated procedures, which this court should pronounce because the Legislature intended to write a constitutional death penalty law. They urge that we find the mandatory "shall" to be permissive in those cases in which the Legislature has directed that the penalty "shall" be death, and suggest that since the form of the hearing at which judgment is pronounced is not set out in these statutes this court may

---

that such victim was a peace officer engaged in the performance of his duties.

"(2) The person killed was a witness to a crime who was killed intentionally for the purpose of preventing his testimony in any criminal proceeding.

"(3) The defendant has two or more prior convictions, based upon separate transactions upon charges separately brought and tried, of the following crimes or any combination of such crimes:

"(i) Arson as defined in Section 447a or 448a which resulted in bodily harm to another.

"(ii) Rape as defined in Section 261.

"(iii) Robbery as defined in Section 211.

"(iv) Burglary in the first degree as defined in Section 460 and which was committed while armed with a deadly weapon or in the commission of which the defendant assaulted any person.

"(v) Kidnapping as defined in Section 207 or 209.

"(vi) Violation of Section 286 committed by force or violence and against the will of the victim.

"(vii) Violation of Section 288a committed by force or violence and against the will of the victim.

"(viii) Escape as described in subdivision (a) of Section 4530 or in Section 4532 and which is by force or violence.

"(ix) Assault with a deadly weapon or by any means of force likely to produce great bodily injury.

"(x) Assault by a prisoner as defined in Section 4500 or 4501.

"(xi) Trainwrecking as defined in Section 219.

"(xii) Skyjacking as defined in Section 210.5.

"(4) The killing was by means of torture which was committed with the intent to cause suffering and did cause suffering over a period of time.

"(5) The defendant has in this or in any prior proceeding been convicted of more than one offense of murder of the first or second degree.

"(6) *There are no substantial facts in mitigation of the offense, and any of the following is true:*

"(i) *The defendant's background, history, and prior criminal record, if any, demonstrate, beyond a reasonable doubt, that there is no substantial likelihood of his being reformed and rehabilitated.*

"(ii) *There were aggravating circumstances surrounding the commission of the offense which demonstrate, beyond a reasonable doubt, that there is no substantial likelihood of his being reformed and rehabilitated.*

"(iii) *There were aggravating circumstances surrounding the commission of the offense which, when viewed in light of the defendant's background, history, and prior criminal record, if any, demonstrate beyond a reasonable doubt that there is a substantial likelihood that the defendant will willfully and unlawfully kill another human being.*" (Sen. Bill No. 450, Mar. 14, 1973. Italics added.)

Subdivision (6) was deleted in its entirety by a June 4, 1973, amendment.

prescribe procedures that will satisfy the requirements of the Eighth and Fourteenth Amendments. We decline the People's invitation. They ask us not to interpret, but to rewrite the law in a manner which we have shown would be contrary to the manifest legislative intent in enacting sections 190 through 190.3. Decisions as to which criminal defendants shall suffer the death penalty, whether these decisions shall be made by judge or jury, whether and to what extent a jury determination is reviewable by the trial court and/or the reviewing court, and the scope of responsibility to be given this court to safeguard against arbitrary imposition of the death penalty are matters of legislative concern. Were this court to attempt to devise the necessary procedures and criteria we would not only invade the legislative province, but would also be in the position of having to pass objectively on the constitutionality of procedures of our own design. (Cf. *Reynolds* v. *Superior Court* (1974) 12 Cal.3d 834, 845-846 [117 Cal.Rptr. 437, 528 P.2d 45].)

■ We conclude therefore that because sections 190 through 190.3 make death a mandatory punishment for those categories of first degree murder encompassed by the special circumstances enumerated in section 190.2, without provision for consideration of evidence of mitigating circumstances as to the offense or in the personal characteristics of the defendant, and afford no specific detailed guidelines as to the relevance of such evidence in determining whether death is an appropriate punishment, they permit arbitrary imposition of the death penalty in violation of the Eighth and Fourteenth Amendments to the United States Constitution. ■. Those provisions which establish procedures for imposition of the death penalty are therefore invalid and petitioner may not be required to stand trial thereunder. The death penalty provisions are, however, clearly severable from the remaining penalty provisions of section 190 decreeing that the penalty for murder in the first degree in cases in which death is not imposed shall be "confinement in the state prison for life." The Legislature has expressed its intent that if any provision of these sections is invalid, the invalidity shall not affect those remaining provisions which can be given effect. (Stats. 1973, ch. 719, § 15, p. 1302.) Petitioner may therefore be sentenced to a term of life imprisonment if no other bar to imposition of judgment on the jury verdict of first degree murder is shown.

Let the peremptory writ of prohibition issue as prayed.

Tobriner, J., Mosk, J., Sullivan, J., and Richardson, J., concurred.

**CLARK, J.**—Four years ago, in *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726], the United States Supreme Court struck down the death penalty statutes of Georgia and Texas on the ground they violated the federal Constitution's prohibition against "cruel and unusual" punishment. Those states wishing to reenact capital punishment studied *Furman,* of course, to determine what, specifically, had rendered the Georgia and Texas statutes unconstitutional. Because each of the nine justices wrote a separate opinion in that case, and none spoke for the court, certainty was not possible. However, the consensus in the legal community was that the high court disapproved of death penalty statutes conferring discretion upon the sentencing authority, and that the court would uphold legislation which eliminated the element of discretion by making the death penalty mandatory for certain offenses. Subscribing to this interpretation of *Furman,* California enacted a "mandatory" capital punishment system.

The high court, in *Gregg* v. *Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909] and its companion cases, has now held such statutes unconstitutional. Therefore, this court has no choice but to invalidate the California law. To save the statute we would have to rewrite it under the guise of interpretation, construing it contrary to the plain intention of the Legislature, which we must not do. The failure of the high court to make itself understood in *Furman* is regrettable. Because of it, California's good faith effort to enact a constitutional capital punishment system has been frustrated. However, while the high court invalidated mandatory statutes, it upheld statutes having certain other characteristics and the latter may serve as models if the Legislature once again seeks to express the will of our people on this issue.[1]

Benefitted by the hindsight provided by the high court's recent decisions, we now know that the death penalty statutes reviewed in *Furman* were unconstitutional, not because they conferred discretion upon the sentencing authority, but because the discretion conferred was "standardless." (See, e.g., *Woodson* v. *North Carolina* (1976) 428 U.S. 280, 302 [49 L.Ed.2d 944, 960, 96 S.Ct. 2978].) In the intervening four years, however, all was confusion. As stated, each of the nine justices wrote a separate opinion in *Furman.* Moreover, as one commentator observed, "no more than three of the five whose votes saved the lives of the

---

[1]Proposition 17, an initiative measure nullifying *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880] by amending the California Constitution to expressly provide that the death penalty is not "cruel or unusual" punishment, was approved by 67 percent of those voting in the general election on 7 November 1972.

petitioners agreed upon either the nature of the question before the Court or the type of tests appropriately employed in eighth amendment litigation." (Wheeler, *Toward a Theory of Limited Punishment II: The Eighth Amendment After Furman v. Georgia* (1972) 25 Stan.L.Rev. 62.)

The per curiam opinion provided no rationale for the decision but simply announced the result: "The Court holds that the imposition and carrying out of the death penalty in these cases constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." (*Furman v. Georgia, supra,* 408 U.S. at pp. 239-240 [33 L.Ed.2d at pp. 350-351].) In his dissenting opinion, Chief Justice Burger remarked: "Since there is no majority of the Court on the ultimate issue presented in these cases, the future of capital punishment in this country has been left in an uncertain limbo. Rather than providing a final and unambiguous answer on the basic constitutional question, the collective impact of the majority's ruling is to demand an undetermined measure of change from the various state legislatures and the Congress." (408 U.S. at p. 403 [33 L.Ed.2d at p. 444].)

In an attempt to mitigate the confusion generated by *Furman,* a committee created by the National Association of Attorneys General and consisting of the attorneys general of 11 states addressed itself to "a consideration of the most promising alternatives for the states' legislatures to consider in those jurisdictions trying to reinstate the death penalty . . . ." "The alternative considered most preferred as best withstanding constitutional attack" was "a mandatory death penalty for specified offenses." (Summary of Proceedings, Nat. Assn. of Attys. Gen., Dec. 3-6, 1972, pub. of Council of State Governments. Mar. 1973.) When the committee's report was discussed at the association's 1972 Winter Meeting, Attorney General Robert L. Shevin of Florida, a member of the committee, was asked to comment on the modified discretionary death penalty statute that state passed in response to *Furman.* Attorney General Shevin responded, according to the summary of proceedings, "that he was not going to say it is a patently unconstitutional law," but he "did say it is highly questionable and that it was not his first choice," his first choice having been the mandatory death sentence for specified offenses. (*Id.* at p. 24.) Were it not literally a matter of life or death, the entire affair would assume the character of a comedy of errors in light of later events—the high court upheld the discretionary death penalty statute that Attorney General Shevin considered "highly questionable" (*Proffitt v. Florida* (1976) 428 U.S. 242 [49 L.Ed.2d 913, 96 S.Ct. 2960])

whereas it struck down statutes conforming to the committee's recommendations and defended by, e.g., the committee chairman, Attorney General Larry Derryberry of Oklahoma (*Williams* v. *Oklahoma* (1976) 428 U.S. 907 [49 L.Ed.2d 1215, 96 S.Ct. 3218]).

Like the National Association of Attorneys General, the Legislatures of most of the states were misled by *Furman.* Of the approximately 35 states that responded to *Furman* by reenacting some form of capital punishment, over half, amicus informs us, adopted mandatory death penalty statutes. Nor were the state courts any more capable of understanding the implications of that decision. The mandatory statutes which the high court subsequently struck down had all been upheld by the courts of the respective states. (Compare *Woodson* v. *North Carolina* (1976) 428 U.S. 280 [49 L.Ed.2d 944, 96 S.Ct. 2978]; *Roberts* v. *Louisiana* (1976) 428 U.S. 335 [49 L.Ed.2d 974, 96 S.Ct. 3001]; and *Williams* v. *Oklahoma* (1976) 428 U.S. 907 [49 L.Ed.2d 1215, 96 S.Ct. 3218] with *State* v. *Woodson* (1975) 287 N.C. 578 [215 S.E.2d 607]; *State* v. *Roberts* (La. 1975) 319 So.2d 317; and *Williams* v. *State* (Okla.Crim. 1975) 542 P.2d 554.)

California was one of the states which relied to its detriment on the apparent significance of *Furman.* There is simply no escaping the conclusion that our Legislature intended to and did enact a mandatory statute, believing that such a statute was most likely to withstand constitutional challenge. The Attorney General does his best to defend the statute but the position he now takes—judicial reconstruction—and the position he took prior to the high court's recent decisions are inconsistent. The first case to reach this court challenging the current statutes was *People* v. *Bernard,* Crim. 17959. The number and quality of amicus briefs filed in that case caused it to be treated as the leading case by parties involved in subsequent cases. In *Bernard,* the Attorney General asserted: "California, by removing the punishment selection function from the jury and establishing a mandatory punishment based solely upon factual determinations has clearly complied with the holding of *Furman* and established a nondiscretionary scheme."

As Justice Holmes observed, hard cases tend to make bad law. Because our Legislature so clearly intended to enact a constitutional death penalty statute, and because its failure to do so was so clearly caused by the *Furman* court's failure to provide intelligible guidelines for legislation, one is tempted to accept the Attorney General's frank

invitation to save the law by rewriting it under the guise of interpretation. However, the courts must not, in this case or any other, act as a super-legislature.

The will of the people of California was clearly expressed in the overwhelming adoption of Proposition 17. (See fn. 1, *ante.*) And the high court has at last clarified the means by which the people's will may be translated into law. The rest is up to the Legislature.

McComb, J., concurred.

The petition of the real party in interest for a rehearing was denied January 5, 1977.