[Crim. No. 21783. Dec. 31, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
DERMON LOUISE WILLIAMS, Defendant and Appellant.

**COUNSEL**

Howard Goodman, under appointment by the Supreme Court, for Defendant and Appellant.

Quin Denvir, State Public Defender, as Amicus Curiae on behalf of Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

Stanley M. Roden, District Attorney (Santa Barbara), and Gerald McC. Franklin, Deputy District Attorney, as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

**BIRD, C. J.**—May a trial court dismiss, pursuant to Penal Code section 1385,[1] a finding of special circumstances under California's death penalty statute (§§ 190-190.5) so that a sentence of life imprisonment without the possibility of parole may be modified?

### I.

Appellant was charged with one count of violating section 187 (murder), with special circumstance allegations that the murder was committed during the commission of a robbery (§ 190.2, subd. (a)(17)(i)) and burglary (§ 190.2, subd. (a)(17)(vii)); two counts of burglary (§ 459); and three counts of robbery (§ 211). The first trial ended in a mistrial after the jury was unable to reach a verdict on any of the counts. At the second trial, appellant was convicted on all the counts and was sentenced to life imprisonment without the possibility of parole. This appeal follows.

Two incidents are involved in this case. The first took place on December 11, 1978, when the home of Maggie Loney in Long Beach was burgled. According to Mrs. Loney,[2] she answered a knock at her door about 10 p.m. A female responded and indicated she had been hit in the stomach and would like to use the phone. When Mrs. Loney opened the door, two males rushed in. The woman went over to the telephone and one of the men disappeared into a back room. Mrs. Loney went to investigate and was grabbed from behind by the other man. She was thrown to the floor and tied up with pieces of cloth torn from two of her dresses and a pillowslip. She yelled at the man not to hurt her; he responded that she had better shut her mouth or he would kill her.

Mrs. Loney lay on the floor until after the people left. She then worked herself free and discovered that many items had been taken

---

[1]Section 1385 states, "The judge or magistrate may, either of its own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. The reasons of the dismissal must be set forth in an order entered upon the minutes. No dismissal shall be made for any cause which would be ground of demurrer to the accusatory pleading."

All statutory references are to the Penal Code unless otherwise indicated.

[2]Portions of Mrs. Loney's testimony at the preliminary examination were read into the record. In addition, she testified in person.

from her home. She sustained no injuries. At the preliminary hearing, she identified appellant as the woman who had sought entry. Previously, however, she had identified a photograph of appellant's 12-year-old daughter, Nini, as the female who had come to the door.

The second incident occurred on December 17, 1978. According to David Dickey, who lived with his 85-year-old mother in Long Beach, he heard a knock at the door about 10 p.m. A woman outside stated that she wanted to use the telephone for an emergency. When he opened the door, the woman and three other people entered the house. Mr. Dickey was knocked over the head with an iron and lost consciousness. When he came to, his legs and hands were tied and he had been beaten about the shoulders. He managed to reach the home of his neighbor, Mrs. Robinson, who untied him. He then returned home and found that various items, including television sets and dresses, had been taken. He identified appellant as the woman at the door.

After calling the police, Mrs. Robinson went next door and found the Dickey house in a shambles. She also discovered Mrs. Dickey in the back bedroom on the floor. There were spots of blood on Mrs. Dickey's chest and she complained that the front of her neck hurt. There were bindings around her arms, but Mrs. Robinson did not remember seeing any other bindings. She did recall Mrs. Dickey saying, "They tried to break my neck. Why did they do it?"

Mrs. Dickey died soon after the robbery. A deputy medical examiner for the coroner's office testified that there were two causes of death—a stab wound penetrating the chest and a blunt force injury causing a fracture of the odontoid process of the second cervical vertebra. The victim had been stabbed below the right armpit, the weapon penetrating four inches into the chest. The other injury had resulted in compression of the spinal cord. The medical examiner testified at first that "[c]onsiderable" force was necessary to break the odontoid process, a projection from the second vertebra upon which the skull rotates. Later, however, he stated that "[n]ot a great deal of force" was required to cause the injury. This was in recognition of Mrs. Dickey's age and the brittleness of her bones. Each injury in itself was sufficient to cause death.

There was severe bruising around the neck and a ligature-type imprint on the back of the neck, according to the medical examiner's testimony. He defined ligature as "[a]ny rope-like, flexible instrument."

He surmised that the blunt force injury had been caused by a jerk with a ligature tied around Mrs. Dickey's neck.

William Collette, a Long Beach police officer, testified that appellant made a statement to him on January 12, 1979, in which she admitted participating in both crimes.[3] According to this statement, she had met a man known as "Fast Eddie"[4] shortly before these events. Soon after they met, Eddie moved in with her and her two children. One evening, he told her that he had "pulled a job" with someone else. This occurred before the Loney burglary.

On December 11, 1978, she was walking near the Loney residence with Eddie, her daughter Nini, and Nini's teenage boyfriend David. They decided they needed money and would obtain it by taking items from the Loney home. They quickly devised the plan which resulted in Mrs. Loney opening her front door. Appellant was the woman who knocked on the door. She did not intend to take anything when she entered the home, but subsequently searched the living room for valuables. She did not find or take anything. However, Nini found about $200. Appellant did receive some money from the sale of a television set taken from the home.

Officer Collette further testified that appellant told him about the second incident. That time, the robbery was planned in advance. Nini suggested the Dickeys because she thought they had money. The group decided to bring pieces of cloth to tie up the victims. They tore up a bedsheet and braided it into ropes. Besides the four people who had participated in the earlier episode, a man known as "Smooth" was the driver of the getaway vehicle in the second robbery. Appellant obtained entry in a manner similar to that utilized at the Loney residence.

According to appellant's statement, Eddie came in with her and asked for a glass of water. When Mr. Dickey handed Eddie a glass, Eddie and David jumped him and hit him with an iron. She said that she did not see this occur, but Eddie had informed her of it later. Appellant proceeded to a back bedroom where she found a woman. She placed

---

[3]In addition to Officer Collette's testimony, the jury heard a tape of his interrogation of appellant.

[4]"Fast Eddie" Palmer was tried separately before the same court and convicted of murder with special circumstances. He received a sentence of life imprisonment without the possibility of parole.

one hand over the woman's mouth and the other on her throat, holding her down. One of the braids was placed by appellant in the woman's mouth and a second braid was tied around her head to secure the first braid. Then, appellant went to the front room to search for valuables. She heard Nini scream from the back bedroom. Eddie ran into the room in front of her. She saw Eddie strike the victim, who fell to the ground. When they left, Eddie told her he had stabbed the old woman with a knife that he had taken from Mr. Dickey. Appellant received a share of the proceeds from the robbery.

Appellant went on to inform Officer Collette that she started staying at her sister's home in Los Angeles rather than her own home in Long Beach shortly after the incident. On December 19, 1978, she learned that Mrs. Dickey had died. On December 30, 1978, she came to Long Beach where she met Eddie, who told her that Nini had been arrested. She called the police station to confirm this, giving her true name but a false address. She and Eddie then decided to go to San Antonio, Texas.

They went to the bus station and bought tickets, but Eddie fell asleep waiting for the bus. Appellant cashed in the tickets, bought one ticket for Memphis, where her mother lived, and left Eddie behind. She spent one week in Memphis with her mother and told her what had happened. Her mother told appellant to return to Los Angeles and turn herself in. Appellant did so, arriving in Los Angeles at 5 a.m. on January 12th. She walked to the police station and waited until Officer Collette arrived at approximately 8 a.m.

Appellant's testimony at trial was in substantial conformity with her statement to Officer Collette. However, she stated that she had participated in the criminal ventures because she was afraid of Eddie. She admitted that Eddie had never hit or quarrelled with her, but claimed that he had once threatened to kill Nini and told her he would do so if Nini did not go along with the second robbery. She further claimed that Eddie gave her drugs, including heroin, which she had taken on the night of the Dickey robbery.

Appellant testified that she had found Mrs. Dickey in the back bedroom, getting out of bed and hollering. When Eddie yelled at her to quiet the old woman, she put her hand over Mrs. Dickey's mouth and held her down in an attempt to do so. She stated that she did this so that Eddie would not kill Mrs. Dickey. She then put one braid in Mrs. Dickey's mouth and secured it with a second strip of cloth. She did not

use much force or tie the strip very tight. Appellant denied receiving any money from either robbery.

On the murder charge, the jury was instructed solely on first degree felony murder. (CALJIC Nos. 8.21 and 8.27 (aider and abettor).) They were instructed to find specific intent only as to the underlying robbery and burglary. (CALJIC No. 3.31.) Although special circumstances were charged and found, the prosecutor did not seek the death penalty and no penalty hearing was held. (See § 190.4.)

At the sentencing hearing, the court stated its opinion that life imprisonment without possibility of parole was appropriate for Eddie Palmer because he had armed himself and stabbed the victim. (See fn. 4, *ante.*) The court continued, "Insofar as this defendant is concerned, the evidence appears that she was one of the persons who planned the operation, she was the person who applied one ligature to the mouth of the victim and behind the neck. [¶] Now, by the testimony of the doctor it appears because of the age of the victim and the fragility of the neck bones that the application caused a fracture in one of the processes of the neck which, in turn, put pressure on the spinal cord. [¶] This doctor without dispute said that as to cause of death, without medical intervention either the stab wound and/or the application of ligature and fracture with the pressure on the spinal cord together or separately would ultimately have brought the death of the lady. [¶] But on a scaling, I feel that on culpability this defendant was much less culpable than the defendant Eddie Palmer.

"My desire legally would be to sentence this lady and eliminate by staying the execution of the special circumstances and eliminate the without possibility of parole. I do not believe that looking at the Penal Code and the intent of the Legislature and as interpreted by the Appellate Courts, I do not believe I have that power. So I will have to sentence as I did with Eddie Palmer." The court thereupon sentenced appellant to life imprisonment without the possibility of parole.

## II.

■ Appellant contends that the trial court did have the authority to dismiss the special circumstances findings under section 1385. She asserts that nothing in the death penalty legislation forbids the exercise of the power to dismiss. In order to resolve this question, an examination of the history and purpose of section 1385 is necessary.

The trial court's power to dismiss an action has been recognized by statute since the first session of the Legislature in 1850. The rules of criminal procedure enacted in that session included the provision that "[t]he Court may, either of its own motion, or upon the application of the District Attorney, and in furtherance of justice, order any action, after indictment, to be dismissed; but in such case the reasons of the dismissal shall be set forth in the order, which must be entered on the minutes." (Stats. 1850, ch. 119, § 629, p. 323.) With slight changes, this provision became section 1385 when the Penal Code was enacted in 1872.[5]

In a series of cases commencing with *People* v. *Burke* (1956) 47 Cal.2d 45 [301 P.2d 241], this court has considered the scope of the trial court's authority to dismiss pursuant to section 1385. In *Burke*, a defendant was charged with the possession of marijuana in violation of Health and Safety Code section 11500. The information also charged a prior conviction for violation of the same section. The defendant admitted the prior conviction at arraignment and was convicted of the charged offense. At that time, Health and Safety Code section 11712 provided a punishment of not more than one year in county jail or not more than 10 years in state prison for any person convicted of violating section 11500. However, if the defendant had a previous conviction under that section, the statute stated that "'he shall be imprisoned in the state prison for not less than two years nor more than 20 years.'" (*Id.*, at p. 50, italics omitted.)

Defense counsel requested that the court strike the prior conviction for the purpose of sentencing. The court did so and sentenced the defendant to a term in the county jail. On the defendant's appeal from the conviction, the state argued that the trial court had erred.

This court held that section 1385 was applicable to the dismissal of the prior conviction. "The procedure of 'striking,' or setting aside or dismissing, a charge of a prior conviction (or any of multiple counts or

---

[5]In 1851, the phrase "after indictment" was changed to "or indictment." (Stats. 1851, ch. 29, § 597, p. 279.) The 1872 version read, "The Court may, either of its own motion or upon the application of the District Attorney, and in furtherance of justice, order an action or indictment to be dismissed. The reasons of the dismissal must be set forth in an order entered upon the minutes." In 1951, "Court" became "court," "District Attorney" was changed to "prosecuting attorney," the phrase "or indictment" was dropped, and the third sentence was added. (Stats. 1951, ch. 1674, § 141, p. 3857.) In 1980, "judge or magistrate" was substituted for "court." (Stats. 1980, ch. 938, § 7, p. 2968.)

allegations of an indictment or information) at the time of sentence is not expressly provided for by statute but it is commonly used in trial courts, not only where the prior conviction has not been legally established, but also where the fact of the conviction has been shown but the trial court has concluded that 'in the interest of justice' defendant should not be required to undergo a statutorily increased penalty which would follow from judicial determination of that fact." (*People* v. *Burke, supra*, 47 Cal.2d at p. 50.)

Nonetheless, the state argued that dismissal was improper because the statute required that the defendant "'*shall* be imprisoned in the state prison. . . .'" (*Id.*, at p. 51; italics added.) It was contended that the language of the statute revealed that "the Legislature intended to take from the court the power to dismiss or strike a charge of prior conviction if the defendant admits the charge." (*Ibid.*) The state claimed that other statutes (and the cases interpreting them), which purported to require certain punishment or action by the trial court, were analogous. (*Id.*, at p. 52.)

This court rejected the claim and held that the language of these statutes was insufficient to preclude the exercise of the court's power to dismiss under section 1385. "The cited cases—and the statutes referred to—do not purport to divest the trial court (or to hold that the court constitutionally could be divested) of the power to control the proceedings before it insofar as the essentials of the judicial process are concerned; i.e. to find the defendant guilty or not guilty of any offense charged, or of a lesser included offense, or to dismiss the action *in toto* or to strike or dismiss as to any or all of multiple counts or charges of prior conviction. The statutes in question do validly—and in respect to constitutionally vested judicial power they neither purport to nor validly could do more than—prescribe the sentence which must be imposed upon the appropriate adjudication of guilt of the substantive crime and judicial determination of the factor which results in increased punishment. Such adjudication and judicial determination are inherently and essentially the province of the court even as the punishment which may or must follow the offense adjudicated, either with or without a punishment augmentation factor, is essentially for the Legislature except as it may vest an area of discretion in the court or administrative body." (*Id.*, at p. 52.)

Thereafter, the Legislature specifically set down the requirement in former Health and Safety Code section 11718 that the trial court could

not dismiss a finding of a prior conviction unless requested by the prosecutor. In *People* v. *Sidener* (1962) 58. Cal.2d 645 [25 Cal.Rptr. 697, 375 P.2d 641], this court upheld the statute against a claim that it violated the separation of powers doctrine (Cal. Const., art. III, § 3 (formerly art. III, § 1), art. VI, § 1) by conditioning the exercise of a judicial power on the approval of the prosecutor. (*Id.*, at p. 650.) Justice Schauer, joined by Justices McComb and White, dissented, arguing that the statutory provision violated the separation of powers doctrine as well as the due process requirement of the Constitution. (*Id.*, at pp. 652-653.)

The four-to-three decision of *Sidener* was overruled by a unanimous court in *People* v. *Tenorio* (1970) 3 Cal.3d 89 [89 Cal.Rptr. 249, 473 P.2d 993]. This court noted that "... [n]o decision, and no legislation, prior to the adoption of section 11718 denied that the judiciary has that power to dismiss which was originally codified in the forerunner of section 1385." (*Id.*, at p. 94.) The statute impermissibly infringed on that power.

"When the decision to prosecute has been made, the process which leads to acquittal or to sentencing is fundamentally judicial in nature. Just as the fact of prosecutorial discretion prior to charging a criminal offense does not imply prosecutorial discretion to convict without a judicial determination of guilt, discretion to forego prosecution does not imply discretion to sentence without a judicial determination of those factors which the Legislature has never denied are within the judicial power to determine and which relate to punishment. The judicial power is compromised when a judge, who believes that a charge should be dismissed in the interests of justice, wishes to exercise the power to dismiss but finds that before he may do so he must bargain with the prosecutor. The judicial power must be independent, and a judge should never be required to pay for its exercise." (*Ibid.*)

After *Sidener* but prior to *Tenorio*, this court considered the validity of a trial court's order dismissing an entire action following a conviction for two counts of robbery. In *People* v. *Superior Court* (*Howard*) (1968) 69 Cal.2d 491 [72 Cal.Rptr. 330, 446 P.2d 138], the trial court stated that its dismissal was based on insufficient evidence to support the convictions and a violation of the right to counsel under *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]. This court upheld the trial court and found that "the discretion of the judge [under section 1385] is absolute except where the Legislature has

specifically curtailed it." (*People* v. *Superior Court* (*Howard*), *supra*, 69 Cal.2d at p. 502.) "[W]here the Legislature has sought to curtail the discretion of the trial judge to dismiss on his own motion and to permit dismissal only on motion of the prosecutor, it has spoken with unmistakable clarity." (*Id.*, at p. 503, citing *Sidener* and former Health & Saf. Code, § 11718.)

In *Howard*, this court noted the policies served by section 1385. "In our opinion, the standard of furtherance of justice will best be served if we recognize discretion in the trial judge, who viewed the witnesses and heard the conflicting testimony, to dismiss on the basis of the reasons he has set forth rather than severely limit such discretion to cases where the evidence is insufficient as a matter of law.

"A determination whether to dismiss in the interests of justice after a verdict involves a balancing of many factors, including the weighing of the evidence indicative of guilt or innocence, the nature of the crime involved, the fact that the defendant has or has not been incarcerated in prison awaiting trial and the length of such incarceration, the possible harassment and burdens imposed upon the defendant by a retrial, and the likelihood, if any, that additional evidence will be presented upon a retrial. When the balance falls clearly in favor of the defendant, a trial court not only may but should exercise the powers granted to him by the Legislature and grant a dismissal in the interests of justice." (*Id.*, at p. 505.)

The *Howard* rule of statutory construction was applied in *People* v. *Dorsey* (1972) 28 Cal.App.3d 15 [104 Cal.Rptr. 326]. There, the defendant was convicted of second degree murder and assault with a deadly weapon. The jury found that he had used a firearm in the commission of the offenses. (Former § 12022.5.) Section 12022.5 required an additional five-year to life period of confinement in state prison for that use.[6] The trial court stated that it would have dismissed the use findings if it had the power.

---

[6]Former section 12022.5 provided in pertinent part:

"Any person who uses a firearm in the commission or attempted commission of ... murder ... upon conviction of such crime, shall, in addition to the punishment prescribed for the crime of which he has been convicted, be punished by imprisonment in the state prison for a period of not less than five years. Such additional period of imprisonment shall commence upon expiration or other termination of the sentence

The Court of Appeal held the trial court did have that power. "Thus we have had approval of the striking of an admitted prior for sentencing purposes (*Burke*), of an entire charge after a guilty verdict (*Howard*), an entire charge to avoid an unnecessary trial which would presumably only result in a concurrent sentence [*People v. Superior Court (Mowry)* (1971) 20 Cal.App.3d 684 (97 Cal.Rptr. 886)], and the complete avoidance of the provisions of Penal Code, section 12022.5, in a plea bargain situation [*People v. Flores* (1971) 6 Cal.3d 305 (98 Cal.Rptr. 822, 491 P.2d 406)]. The distinction between these situations and the instant one in which the court desires, as part of its sentencing responsibility, to dismiss a use of a firearm allegation strikes us as a distinction without a difference." (*Id.*, at p. 18.) "If the Legislature intends that the provisions of Penal Code, section 12022.5, not be subject to dismissal, it could and should so indicate." (*Id.*, at p. 19.)

The court also discussed the policy served by section 1385. "Mandatory, arbitrary or rigid sentencing procedures invariably lead to unjust results. Society receives maximum protection when the penalty, treatment or disposition of the offender is tailored to the individual case. Only the trial judge has the knowledge, ability and tools at hand to properly individualize the treatment of the offender. Subject always to legislative control and appellate review, trial courts should be afforded maximum leeway in fitting the punishment to the offender." (*Id.*, at p. 18.)

The rule of statutory construction developed in *Burke* and reiterated in *Howard* and *Dorsey* is clear. Section 1385 permits dismissals in the interest of justice in any situation where the Legislature has not clearly evidenced a contrary intent. The policies behind this rule were articulated in the *Howard* and *Dorsey* cases.

In *People v. Tanner* (1979) 24 Cal.3d 514 [156 Cal.Rptr. 450, 596 P.2d 328], this court found that the trial court did not have the authority to strike a use finding in order to place an otherwise ineligible defendant on probation, because the Legislature had precluded such an exercise of judicial discretion. Section 1203.06, enacted in 1975, provided that "Notwithstanding the provisions of Section 1203: (a)

---

imposed for the crime of which he is convicted and shall not run concurrently with such sentence.

".    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"This section shall apply even in those cases where the use of a weapon is an element of the offense."

Probation shall not be granted to . . .: (1) [a]ny person who personally used a firearm during the commission . . . of any of the following crimes: (iii) Robbery, in violation of Section 211. . . ." The defendant was convicted of robbery and the jury found that he had used a firearm in the commission of the offense. At sentencing, the trial court struck the use finding and sentenced the defendant to probation, including one year in the county jail. The state appealed, arguing that section 1203.06 forbade dismissal of the use finding.

Although section 1203.06 did not expressly state that judicial discretion under section 1385 was precluded, this court found sufficient indices of such an intent in the history of the statute. "We must therefore conclude the Legislature intends discretion may be exercised in the case of crimes falling within section 1203 but not within section 1203.06. Any other construction restores the pre-1975 law allowing a court to grant probation to any criminal if the court deems that to do so would be in the interest of justice. Such judicial resurrection renders the 1975 legislation a nullity." (*Id.*, at p. 520.)

The *Tanner* decision did not purport to overturn *Burke, Howard*, or *Dorsey*. Indeed, the opinion cited *Burke* for the proposition that "[s]ection 1385 has been construed to provide judicial power to dismiss or strike—within the court's discretion—allegations which, if proven, would enhance punishment for alleged criminal conduct." (*Id.*, at p. 518.) Furthermore, it is clear from the opinion that the mere use of mandatory language in the statute does not indicate that section 1385 is inapplicable. If it did, there would have been no need to consider the legislative history or intent. Therefore, section 1385 is applicable in the absence of a specific indication by the Legislature to the contrary.

Turning to the statute before this court, section 190 provides, in part, that "[e]very person guilty of murder in the first degree shall suffer death, confinement in state prison for life without possibility of parole, or confinement in the state prison for a term of 25 years to life. The penalty to be applied shall be determined as provided in Sections 190.1, 190.2, 190.3, 190.4, and 190.5." Section 190.1 establishes the order in which various charges and issues are to be determined. Section 190.2, subdivision (a) provides that "[t]he penalty for a defendant found guilty of murder in the first degree shall be death or confinement in state prison for a term of life without the possibility of parole in any case in

which one or more of the following special circumstances has been charged and specially found under Section 190.4, to be true: ...."[7]

These provisions constitute the relevant portions of the death penalty statute. There is nothing which differentiates these sections from the statutes examined in *Burke* and *Dorsey*, since they also provided for a particular sentence based on the finding of additional factors. Unlike former Health and Safety Code section 11718, discussed in *Sidener* and *Tenorio*, no provision of the death penalty statute seeks to limit the exercise of the trial court's power to dismiss allegations.

The holding in *Tanner* does not compel a contrary result. Section 1203, subdivision (b) contains language virtually identical to that in section 1385. Section 1203.06 specifically holds this language inapplicable: "Notwithstanding the provisions of Section 1203: (a) Probation shall not be granted to...." There is no such provision or requirement in section 190 et seq. Unlike section 1203.06, the death penalty statute is not specific legislation "relating to the limited power of dismissal for purposes of [parole]—the very matter at issue." (*Tanner, supra*, 24 Cal.3d at p. 521.) Sections 190 through 190.5 do not purport to limit the trial court's power to dismiss special circumstance findings in order to permit the possibility of parole. The "unmistakable clarity" which *Howard* requires is absent from this legislation. (*Howard, supra*, 69 Cal.2d at p. 503.)

There is no indication of contrary legislative intent. The present statute was passed by initiative in 1978. In the voters pamphlet for that election, the Legislative Analyst stated, "Generally speaking, the law requires a sentence of death *or* life without the possibility of parole when an individual is convicted of first degree murder under one or more of the following special circumstances .... [¶] The proposition would also expand and modify the list of special circumstances which

---

[7]The punishment of life imprisonment without the possibility of parole for certain categories of first degree murder did not become a part of the state's law until January 1, 1977. Section 190 was amended to provide for such punishment where the defendant was "guilty of murder in the first degree which is perpetrated by means of torture with the intent to kill...." (Stats. 1976, ch. 1124, § 1, p. 5028.) This provision remained a part of section 190 when the determinate sentencing law became operative on July 1, 1977. (Stats. 1976, ch. 1139, § 133, p. 5098.) Thereafter, the Legislature passed a comprehensive bill which provided that life imprisonment without the possibility of parole should be the alternative to capital punishment once any special circumstance was found to exist. (Stats. 1977, ch. 316, §§ 4-14, pp. 1256-1262.) The present statute, passed by initiative in 1978, retains this feature.

require either the death penalty or life without the possibility of parole...." (Legislative Analyst's Analysis, Ballot Pamp., Initiative Statute, Prop. 7, Gen. Elec. (Nov. 7, 1978) p. 32. Original italics.) There is *no* discussion of section 1385 or the court's power to dismiss a special circumstance allegation. The printed argument in favor of the bill refers only to the death penalty and does not discuss the alternative punishment of life without the possibility of parole. (Ballot Pamp., argument in favor of Initiative Prop. 7 as presented to the voters, Gen. Elec. (Nov. 7, 1978) p. 34.)

The legislative history of the 1977 statute is similarly silent on this issue. Life imprisonment without the possibility of parole as a punishment for murder is discussed in only one paragraph of a 14-page analysis of Senate Bill No. 155 prepared by the Senate Committee on the Judiciary. It reads, "Until now the penalty of life imprisonment without the possibility of parole has been rarely used in California. This bill would make it the alternate punishment for all crimes for which the death penalty is authorized. Should the death penalty provisions be held invalid, all those already sentenced to death would be sentenced instead to life imprisonment without the possibility of parole. Thus, the bill, if enacted, would result in an increasing number of prison inmates incarcerated with no hope of eventual release." (Bill Analysis of Sen. Bill No. 155 (as amended Feb. 17, 1977) by Sen. Com. on Judiciary, at pp. 8-9.)[8]

This paragraph suggests that the punishment of life imprisonment without the possibility of parole was written into the law, in part, because the Legislature believed the death penalty provisions might well be held unconstitutional. There is nothing in this passage which suggests that the Legislature contemplated the trial court's power to dismiss under section 1385. Under the normal rules of statutory interpretation, section 1385 is applicable to a special circumstance finding. Thus, it provides the statutory authority to strike a special circumstance finding so that a person can be eligible for parole.

The next issue raised by respondent is whether there is something unique to this death penalty statute which prevents the application of section 1385. In *Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420 [134 Cal.Rptr. 650, 556 P.2d 1101], this court considered the validity of a

---

[8]The analysis also contained this query: "Is it good policy to create this new and exceedingly dangerous category of inmates within our prisons?" (*Ibid.*)

prior death penalty statute which had been passed in the wake of *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726]. *Furman* invalidated a death penalty statute which gave standardless discretion to a jury to impose death as a punishment. In response to *Furman*, section 190 was amended in 1973 to read, "Every person guilty of murder in the first degree shall suffer death if any one or more of the special circumstances enumerated in Section 190.2 have been charged and found to be true in the manner provided in Section 190.1. Every person otherwise guilty of murder in the first degree shall suffer confinement in the state prison for life. . . ." (Former § 190.)

In a series of five cases handed down in July 1976, the United States Supreme Court ruled two similar statutes unconstitutional because they did not provide for consideration of mitigating circumstances or for guided discretion on the part of the sentencing authority. (*Gregg* v. *Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909]; *Proffitt* v. *Florida* (1976) 428 U.S. 242 [49 L.Ed.2d 913, 96 S.Ct. 2960]; *Jurek* v. *Texas* (1976) 428 U.S. 262 [49 L.Ed.2d 929, 96 S.Ct. 2950]; *Woodson* v. *North Carolina* (1976) 428 U.S. 280 [49 L.Ed.2d 944, 96 S.Ct. 2978] [statute unconstitutional]; *Roberts* v. *Louisiana* (1976) 428 U.S. 325 [49 L.Ed.2d 974, 96 S.Ct. 3001] [statute unconstitutional].)

This court discussed those cases in *Rockwell.* "[S]tatutes providing for imposition of the death penalty may neither make that penalty mandatory nor give the jury or judge charged with determining the penalty absolute discretion in the choice of life or death, but must provide standards so that the sentencing authority will 'focus on the particularized circumstances of the crime and the defendant.' (*Gregg* v. *Georgia, supra*, 428 U.S. 153, 199 [49 L.Ed.2d 859, 889].) A statute which enumerates aggravating circumstances, one or more of which must be found as a prerequisite to imposition of the death penalty but which does not provide for 'meaningful opportunity for consideration of mitigating factors presented by circumstances of the particular crime or by the attributes of the individual offender' (*Roberts* v. *Louisiana, supra*, 428 U.S. 325, [333-]334 [49 L.Ed.2d 974, 982]) permits the imposition of capital punishment in violation of the Eighth Amendment's proscription of cruel and unusual punishment, as does a statute which makes death a mandatory punishment for specified categories of murder. (*Woodson* v. *North Carolina, supra*, 428 U.S. 280, 305 [49 L.Ed.2d 944, 961-962].) '[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances

of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.' (*Id.*, [428 U.S.] at p. 304 [49 L.Ed.2d at p. 961].)" (*Rockwell, supra*, 18 Cal.3d at p. 428.)

The death penalty statute considered in *Rockwell* suffered from the same infirmities as those struck down in *Woodson* and *Roberts, supra.* Death was the prescribed punishment once a special circumstance allegation was found to be true. No provision was made for individualized sentencing.

The state argued in *Rockwell* that sections 1181, subdivision 7[9] and 1385 could be applied to save the statute from its constitutional infirmities.

This argument was rejected for a variety of reasons. "First, no provision is made under section 190.1, section 1181, subdivision 7, section 1385, or otherwise for the introduction of evidence of mitigating factors, and no guidance is given as to what factors should be considered 'mitigating.' Second, the procedures approved by the United States Supreme Court require that the sentencing authority, be it judge or jury, weigh the aggravating and mitigating factors in light of specific and detailed guidelines. None of the approved procedures permits the trier of fact to find the aggravating factors of the offense and then permits reduction of an otherwise mandatory death penalty only if the sentencing authority independently finds mitigating circumstances sufficient to warrant mercy.

"Even if we assume that such a procedure is sanctioned by the Eighth and Fourteenth Amendments, however, neither section 1181, subdivision 7, nor section 1385, permits a trial judge to act in the manner suggested by the People." (*Rockwell, supra*, 18 Cal.3d at p. 439.)

First, this court noted that section 1385 provided at least a framework for judicial consideration of special circumstance allegations. "Although section 1385 provides that a dismissal 'in furtherance of jus-

---

[9]Section 1181, subdivision 7, provides that a new trial may be granted upon the defendant's application, "[w]hen the verdict or finding is contrary to law or evidence, but in any case wherein authority is vested by statute in the trial court or jury to recommend or determine as a part of its verdict or finding the punishment to be imposed, the court may modify such verdict or finding by imposing the lesser punishment without granting or ordering a new trial, and this power shall extend to any court to which the case may be appealed."

tice' may be ordered either on the motion of the district attorney, or on the court's motion, a defendant may invite the court to exercise its power by an application to strike a count or allegation of an accusatory pleading, and the court must consider evidence offered by the defendant in support of his assertion that the dismissal would be in furtherance of justice. (*In re Cortez* (1971) 6 Cal.3d 78 [98 Cal.Rptr. 307, 490 P.2d 819], *People v. Tenorio* (1970) 3 Cal.3d 89 [89 Cal.Rptr. 249, 473 P.2d 993].)" (*Rockwell, supra*, 18 Cal.3d at pp. 441-442.)

Since section 1385 provided a mechanism by which the trial court could consider striking a special circumstance finding, the next question was whether section 1385 applied. "[This court has] not heretofore had occasion to consider whether this power to strike allegations in an accusatory pleading extends to the integrated statutory scheme for imposition of the death penalty established by sections 190 through 190.3. The language of those sections, the omission therefrom of any provision for a hearing on mitigating circumstances, and the history of their adoption leads us to conclude that this would be contrary to the legislative purpose. The Legislature did not intend the jury verdict on special circumstances to be merely advisory, but contemplated death as a mandatory penalty whenever special circumstances were found unless precluded by section 190.3." (*Rockwell, supra*, 18 Cal.3d at p. 442.)

The language of the 1973 statute clearly demonstrated an intent by the Legislature that imposition of the death penalty be mandatory. No provision was made for consideration of mitigating factors or for the striking of special circumstance allegations.

In addition, the history of the statute bore out the fact that this was the Legislature's intent. Provisions which would have permitted consideration of mitigating factors were deleted from Senate Bill No. 450 before it was codified into sections 190 through 190.3. (*Rockwell, supra*, 18 Cal.3d at p. 443.) "There is simply no escaping the conclusion that our Legislature intended to and did enact a mandatory statute, believing that such a statute was most likely to withstand constitutional challenge." (*Id.*, at p. 448, conc. opn. of Clark, J.) In *Rockwell*, this court was confronted with a statute clearly designed to be mandatory in order to meet what were then regarded as the constitutional requirements for a death penalty statute.

There is no indication that the drafters of the current death penalty law believed the death penalty statute would be ruled unconstitutional

unless life imprisonment without the possibility of parole was made mandatory once a special circumstance allegation was found. *Gregg* and *Rockwell* certainly would give rise to no such belief. Indeed, the route taken by the Legislature in 1977 and the voters in 1978 indicates a contrary intent—to provide for discretion and the consideration of mitigating factors in the imposition of the death penalty.

Were this court to find that the present statute retained the design and purpose of the 1973 legislation, the statute would have to be held unconstitutional for the reasons expressed in *Rockwell*. Thus, the history and intent which were central to the inquiry in *Rockwell* are not only irrelevant here, they are necessarily absent.

Furthermore, the application of section 1385 to the 1973 legislation would have drastically altered the nature of the statute. "To save the statute we would have to rewrite it under the guise of interpretation, construing it contrary to the plain intention of the Legislature, which we must not do." (*Rockwell, supra*, 18 Cal.3d at p. 446, conc. opn. of Clark, J.) The application of section 1385 to the present context requires no such judicial interference or alteration.

Once it is recognized that the history and intent behind the 1973 legislation are inapposite to the current law, only the bare words of the statute are left. As noted in *People* v. *Burke, supra*, 47 Cal.2d 45 and *People* v. *Dorsey, supra*, 28 Cal.App.3d 15, the use of the word "shall" in the statute is insufficient to evidence an intent that the trial court is precluded from exercising its discretionary powers under section 1385. Nothing in the present statute purports to limit this power. Therefore, the trial courts have the authority under section 1385 to dismiss special circumstance findings in order to make it possible for a person to be eligible for parole.[10]

Trial courts will exercise this power in a careful and thoughtful manner. The wise use of this power will promote the administration of justice by ensuring that persons are sentenced based on the particular facts of the offense and all the circumstances. It enables the punishment to fit the crime as well as the perpetrator.

---

[10]The contention of the state that "for all practical purposes there is no such penalty as life without possibility of parole in California because of the commutation powers of the Governor..." is specifically rejected. Such powers, of course, apply equally to death sentences. However, the state fails to argue (and it would be foolish to do so) that, as a result, there is no death penalty in California.

The trial court's findings in the present case provide an example of the proper use of this power. The court also presided over the trial of Eddie Palmer. Based on the facts, it reached the conclusion that "this defendant was much less culpable than the defendant Eddie Palmer."

As noted earlier, appellant was tried on a felony-murder theory. There was no requirement that the jury find that she intended to cause death or even that she personally committed the acts resulting in death. The evidence produced at the trial certainly does not indicate such intent. Furthermore, the underlying felonies, used to establish a murder and then to raise the murder to first degree, were used a third time to establish special circumstances. Although appellant has not challenged the use of the felony-murder concept in this manner, these factors further support the trial court's conclusion.

Sections 190 through 190.5 do not bar the use of the trial court's power under section 1385 to dismiss a finding of special circumstances in order to modify a sentence of life imprisonment without the possibility of parole.[11]

### III.

■ Next, appellant claims that the trial court erred in finding that her waiver of *Miranda*[12] rights was knowing, intelligent, and voluntary. The record does not support this claim.

Officer Collette testified that appellant was brought to his desk at approximately 8:10 a.m. on January 12, 1979. He asked her what she wanted and she replied that she wanted to speak with him concerning her involvement in some "cases." He asked her, "What cases?" Appellant stated, "A robbery and a murder."

Officer Collette took appellant into an interview room and read to her from Los Angeles PD Form 254: "You have the right to remain silent. [¶] Anything you say can and will be used against you in a court

---

[11]No view is expressed on whether the power to dismiss under section 1385 applies to a finding of special circumstances after the jury has returned a verdict of death.

[12]*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

of law. [¶] You have the right to talk to a lawyer and have him present with you while you are being questioned. [¶] If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish one."

Reading from the form, Officer Collette asked, "Do you understand each of these rights I've explained to you?" Appellant answered, "Yes." The officer asked, "Having these rights in mind, do you wish to talk to us now?" Appellant replied, "Yes, I want to talk."

On the other hand, appellant claims she went to the police station to inquire about her daughter, who had been arrested some two weeks earlier. However, this claim is not supported by the record. Rather, the evidence shows that appellant returned to Los Angeles at the prompting of her mother, who told her to turn herself in. Appellant patiently waited three hours at the police station for Officer Collette to arrive and then told him she wanted to talk about "[a] robbery and a murder."

Appellant concedes that Officer Collette properly advised her of her rights under *Miranda*. She contends, however, that the waiver was invalid because she was not aware of the possible penalties for murder, robbery, and burglary or of the intricacies of the felony-murder rule. No authority is cited for this proposition. Although a valid waiver is more likely to be found where the police have provided the fullest possible information, such information is not necessary in every case in order to establish a knowing, intelligent, and voluntary waiver. There is nothing in the record to support the contention that appellant did not understand her rights as they were read to her by Officer Collette.

"'In determining whether there has been a waiver of constitutional rights, the issue must be resolved on the whole record [citations], and its resolution must depend upon the particular facts and circumstances surrounding the case under consideration, including the background, experience, and conduct of the accused. [Citation.]'" (*People* v. *Duren* (1973) 9 Cal.3d 218, 238 [107 Cal.Rptr. 157, 507 P.2d 1365], quoting from *People* v. *Brockman* (1969) 2 Cal.App.3d 1002, 1008 [83 Cal.Rptr. 70].) The prosecution has the burden of showing beyond a reasonable doubt that a suspect knowingly and intelligently waived his *Miranda* rights. (*People* v. *Braeseke* (1979) 25 Cal.3d 691, 701 [159 Cal.Rptr. 684, 602 P.2d 384], judgment vacated and cause re-

manded *sub nom. California* v. *Braeseke* (1980) 446 U.S. 932 [64 L.Ed.2d 784, 100 S.Ct. 2147], reiterated, 28 Cal.3d 86 [168 Cal.Rptr. 603, 618 P.2d 149], cert. den. 451 U.S. 1021 [69 L.Ed.2d 395, 101 S.Ct. 3015].)

"'[T]he particular facts and circumstances surrounding the case under consideration'" (*People* v. *Duren, supra*, 9 Cal.3d at p. 238) support the trial court's finding that appellant did knowingly, intelligently, and voluntarily waive her rights under *Miranda*. The confession was properly admitted.

### IV.

This case is remanded to the trial court for exercise of the court's discretion to determine whether or not there is a basis for dismissing the finding of two special circumstances. In all other respects, the judgment is affirmed.

Tobriner, J., Mosk, J., Newman, J., and Broussard, J., concurred.

**RICHARDSON, J.**—I concur in the majority opinion to the extent that it affirms defendant's conviction of first degree murder, burglary and robbery. I respectfully dissent, however, from the majority's reversal as to penalty. In my view, the trial court very properly sentenced defendant to life imprisonment without the possibility of parole.

The 1978 death penalty law explicitly and unambiguously provides that "[t]he penalty for a defendant found guilty of murder in the first degree *shall* be death or confinement in state prison for a term of life without the possibility of parole *in any case* in which one or more ... special circumstances has been charged and specially found ...." (Pen. Code, § 190.2, subd. (a), italics added.) Despite the mandatory language of section 190.2, the majority now concludes that trial courts may impose a lesser sentence of life imprisonment *with* possibility of parole merely by striking, that is ignoring, the jury's finding of special circumstances. Yet, there is nothing in the language or history of the 1978 death penalty law which indicates that the trial courts were vested with any such broad power to remove the jury's express finding. To the contrary, the clear intent of the framers of that law, and of the sovereign people of this state, as well, who by initiative enacted it, was to impose a *mandatory* sentence of death or life imprisonment *without* pa-

role "in any case" of first degree murder accompanied by a finding of special circumstances.

The majority's rationale is as follows: Trial courts are vested with a general power to dismiss an action in furtherance of justice (Pen. Code, § 1385); "Section 1385 permits dismissals in the interest of justice in any situation where the Legislature has not specifically indicated a contrary intent" (*ante*, p. 482; see also p. 483); because the 1978 death penalty law does not "specifically" withhold the power to dismiss a special circumstances finding such a power may be exercised "in a careful and thoughtful manner." (*Ante*, p. 489.)

Such reasoning is faulty. First of all, the majority's statement of the applicable rule of statutory construction is *directly contrary* to our own recent holdings in *People* v. *Tanner* (1979) 24 Cal.3d 514, 518-520 [156 Cal.Rptr. 450, 596 P.2d 328], and *Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420, 442-443 [134 Cal.Rptr. 650, 556 P.2d 1101]. In each of these cases, the applicable statutes imposed specific penalties for particular crimes without any express withholding of the power to dismiss or reduce those penalties under section 1385. Nevertheless, in both cases we held that, based upon the mandatory statutory language imposing the penalties and the applicable legislative history, we could clearly *infer* an intent to preclude application of the dismissal power under section 1385.

Thus, in *Tanner* the Legislature, without mentioning section 1385, had provided that probation "shall not be granted" to any person using a firearm during a robbery. (Pen. Code, § 1203.06.) We held that "While the Legislature has not assisted us in discerning its intent, we must conclude that when proper findings invoking the operation of section 1203.06 have been made, *the mandatory provisions of that section may not be avoided by employing section 1385 to strike either the allegations of the complaint or the findings of the jury.*" (P. 519, italics added.) Vainly, the dissenting opinion of Justice Tobriner urged that "in the absence of an *explicit* legislative restriction of the section 1385 power" we could not infer any intent to restrict that power. (P. 531, italics in original.) This is precisely the position taken now by the present majority, and we rejected it two years ago.

*Rockwell* is even closer on point, involving as it did interpretation of the penalty provisions of a death penalty law comparable in all perti-

nent respects to the 1978 law which is under present scrutiny. In *Rockwell*, the 1973 death penalty law imposed a mandatory penalty of death for first degree murder accompanied by specified special circumstances. (Former Pen. Code, § 190.) The 1973 act was silent regarding the trial courts' power to dismiss a special circumstances finding or to reduce the penalty otherwise prescribed, and the contention was raised, identical to that now adopted by the present majority, that section 1385 might be invoked "in the interest of justice if mitigating circumstances suggest that the death penalty is not an appropriate punishment." (18 Cal.3d, at p. 441.) We flatly and unanimously rejected the argument, employing in the words of Chief Justice Wright an analysis that is fully applicable here: "We have not heretofore had occasion to consider whether this power to strike allegations in an accusatory pleading extends to the *integrated statutory scheme* for imposition of the death penalty established by sections 190 through 190.3. The language of those sections, the omission therefrom of any provision for a hearing on mitigating circumstances, and the history of their adoption lead us to conclude that this would be contrary to the legislative purpose. *The Legislature did not intend the jury verdict on special circumstances to be merely advisory*, but contemplated death as a mandatory penalty whenever special circumstances were found unless precluded by section 190.3." (P. 442, italics added.)

The majority herein does not purport to overrule either *Tanner* or *Rockwell*, but rather attempts to distinguish those cases on their facts. Accordingly, despite the majority's incorrect recital of the applicable rule of statutory construction (requiring a "specific" or "explicit" reference to § 1385), the analysis contained in those cases survives today's ill-considered ruling, and I reaffirm our *Tanner* and *Rockwell* analysis in considering the issue before us.

As I have noted, in *Rockwell* we focused upon (1) the mandatory language of the penalty provision, (2) the omission of any reference therein to section 1385 or similar dismissal provision, and (3) the applicable legislative history.

1. *Mandatory language.* In *Rockwell*, we stressed that the 1973 act required that a person found guilty of first degree murder "shall suffer death" (former § 190), "shall suffer the penalty of death" (*id.*, § 190.1), and "the penalty ... shall be death" (*id.*, § 190.2), where special circumstances are found. (P. 442.) We further observed that the 1973 act

contained an "integrated statutory scheme" with "detailed procedures" whereby special circumstances are to be charged and tried, including a provision that if two successive juries have been unable to reach a unanimous verdict regarding the special circumstances charge, the court shall dismiss the jury and impose the punishment of life imprisonment. (*Ibid.*) We emphasized that "The Legislature gave the court the power to impose a sentence of life imprisonment only in this instance." (*Ibid.*) We concluded that "These detailed provisions governing the manner by which special circumstances are to be charged and found lead to the conclusion that sections 190 through 190.3 are *special legislation* and that the court presently has *no power under the general grant of authority of section 1385 to strike special circumstances allegations in the interest of justice as an exercise of mercy.* [Citations.]" (P. 443, italics added.)

Similarly, the 1978 act involved here also uses mandatory language substantially identical to the 1973 act. The 1978 act provided that "The penalty for a defendant found guilty of murder in the first degree *shall* be death or confinement in state prison for a term of *life without the possibility of parole in any case in which one or more . . . special circumstances has been charged and specially found . . . to be true.*" (§ 190.2, subd. (a), italics added.) Like the 1973 act, the present statutory scheme contains an integrated and detailed procedure for charging and trying special circumstances. (§§ 190.1-190.4.) Once again, as in the 1973 act, the *sole* authorization for a reduced sentence arises after two successive juries are unable to reach a unanimous verdict as to the special circumstances charge. (§ 190.4, subd. (a).) The multiple and direct parallels between the statutory scheme interpreted by us in *Rockwell* and the 1978 act are simply inescapable. Logic and common sense dictate that they should receive parallel construction.

2. *Omission of reference to section 1385.* In *Rockwell*, we noted that no provision in the 1973 act affirmatively "suggests that the court which has made such a [special circumstances] finding may then strike the allegation it has found true and avoid the command that the death penalty be imposed." (P. 443.) Likewise, nothing whatever in the 1978 act suggests such a power. Section 190.4, subdivision (e), *explicitly authorizes* the trial court to review the jury's *penalty* determination and to modify a verdict or finding imposing the death penalty whenever the verdict or finding as to penalty is contrary to the law or evidence presented. Yet no similar authority is granted to modify or strike a jury's

finding of special circumstances. This omission strongly suggests an intention to withhold that power.

3. *Legislative history.* In *Rockwell,* our conclusion regarding the nonapplicability of section 1385 was supported by the available legislative history of the 1973 act which indicated an intent to preclude any discretionary consideration of mitigating circumstances in deciding the penalty issue. (P. 443.) The 1978 act was adopted as an initiative measure, and the ballot handbook and arguments afford an illuminating view of the intent of the framers of that initiative, and of the people who voted in its favor. (See *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245-246 [149 Cal.Rptr. 239, 583 P.2d 1281], approving consideration of such materials.)

It is significant, in my view, that the legislative analyst's commentary which was given to the voters before the election states that the 1978 measure would "expand and modify the list of special circumstances which *require* either the death penalty or *life without the possibility of parole.*" (Ballot Pamp., Gen. Elec. (Nov. 7, 1978) p. 32, italics added.) There is absolutely no mention made of any trial court power to dismiss or strike a special circumstances finding "in the furtherance of justice." Equally significant is the argument in favor of the initiative measure which stresses to the voters that the measure will provide a "new, tough death penalty law," and indeed "the nation's toughest, most effective death penalty law." (*Id.,* at p. 34.) It is exceedingly doubtful that those who approved the initiative measure (*72 percent in favor* and 28 percent opposed; see *People* v. *Teron* (1979) 23 Cal.3d 103, 124-125 [151 Cal.Rptr. 633, 588 P.2d 773] (dis. opn.)) reasonably anticipated that the seemingly mandatory penalties for first degree murder with special circumstances could be so readily reduced or modified at the discretion of a trial judge by the simple process of striking the jury's special circumstances finding. To the contrary, following such a finding, the trial judge's sole discretion under the act affects the *penalty* only, and *only* to the extent of authorizing imposition of life without possibility of parole in the place of the death penalty.

For all of the foregoing reasons, in my opinion, the majority seriously errs in reading into the 1978 law an implied authority to dismiss or strike a special circumstances finding. This is not what the people of this state thought they were approving when they adopted the 1978 ini-

tiatiye, and this most assuredly is not what we said when we interpreted section 1385 in *Tanner* and the death penalty statutes in *Rockwell*.

Accordingly, I would affirm the judgment in its entirety.

Kaus, J., concurred.

The petitions of both parties for a rehearing were denied February 3, 1982. Richardson, J., was of the opinion that the petitions should be granted.